# In the United States Court of Federal Claims

No. 14-307C
(Filed Under Seal: August 28, 2015)
(Reissued for Publication: September 3, 2015)[*]

*************************************

| | | |
|---|---|---|
| SAVANTAGE FINANCIAL SERVICES, INC., | * | Bid Protest; Financial Management Software Systems and Related Services; |
| | * | Migration to Federal Shared Service |
| Plaintiff, | * | Providers Without Competition; |
| | * | Competition in Contracting Act of 1984; |
| v. | * | Economy Act; Government Management |
| | * | Reform Act of 1994; Subject Matter |
| THE UNITED STATES, | * | Jurisdiction; Ripeness; Standing; |
| | * | Supplementation of the Administrative |
| Defendant. | * | Record; Amendment of Complaint |

*************************************

Timothy F. Noelker, St. Louis, MO, for plaintiff.

William J. Grimaldi, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

**SWEENEY**, Judge

In this bid protest, plaintiff Savantage Financial Services, Inc. challenges the decisions of the United States Department of Homeland Security ("DHS") and its components to acquire financial management software systems and related services without competition.[1]  Before the court are defendant's motion to dismiss, the parties' cross-motions for judgment on the administrative record, plaintiff's motion to supplement the administrative record, and plaintiff's motion for leave to file a second amended complaint.  As explained in more detail below, the court concludes that many of plaintiff's claims should be dismissed on jurisdictional and justiciability grounds, that plaintiff's surviving claims lack merit, and that neither supplementation of the administrative record nor another amended complaint is warranted.

---

[*] The court provided the parties with an opportunity to suggest redactions to this ruling. However, on September 2, 2015, the parties orally represented to the court that no redactions were necessary.

[1] Although the court attempted to minimize the use of acronyms, it did not eliminate them altogether.  A list of selected acronyms and abbreviations is appended to this Opinion and Order.

# I. BACKGROUND

## A. Facts

### 1. DHS's Financial Management Software Systems

Plaintiff is one of five companies that sell financial management software systems and related services to the federal government.[2]  AR 195-96.  Several DHS components use plaintiff's software system, and the remaining DHS components use software systems from among one of the other four companies.  Id.  Specifically:

- Plaintiff's software system (Altimate/FFMS[3]) is used by Immigration and Customs Enforcement ("ICE"), United States Citizenship and Immigration Services ("USCIS"), the National Protection and Programs Directorate ("NPPD"), the Science and Technology Directorate ("S&T"), the Office of

---

[2]  The court derives most of the facts in this Opinion and Order from the administrative record for the amended complaint ("AR"), the original administrative record ("OAR"), and certain publicly available government documents not included in the administrative record.  The court also derives facts from certain documents contained in the appendix attached to defendant's opposition to plaintiff's motion to supplement the administrative record ("DA"); these documents are part of the record created by the pertinent DHS components in making the decision at issue in this bid protest.  The court derives the balance of the facts from five of the six sworn declarations submitted by defendant during these proceedings from Jeffrey Bobich, DHS's Director of Financial Management; Mr. Bobich's first declaration was executed on October 6, 2014 ("First Bobich Decl."); his second declaration was executed on January 8, 2015 ("Second Bobich Decl."); his fourth declaration was executed on February 10, 2015 ("Fourth Bobich Decl."); his fifth declaration was executed on July 24, 2015 ("Fifth Bobich Decl."); and his sixth declaration was executed on August 17, 2015 ("Sixth Bobich Decl.").  Plaintiff did not object to the submission of these declarations, and the court finds that consideration of these declarations is necessary because "the existing record is insufficient to permit meaningful review consistent with the [Administrative Procedure Act]."  Axiom Res. Mgmt., Inc. v. United States, 564 F.3d 1374, 1381 (Fed. Cir. 2009).  Finally, the court derives the procedural history from the parties' filings and its two prior decisions in this matter, Savantage Financial Services, Inc. v. United States, 118 Fed. Cl. 487 (2014), and Savantage Financial Services, Inc. v. United States, 119 Fed. Cl. 246 (2014).

[3]  According to plaintiff's parent company, Savantage Solutions, Am. Compl. ¶ 3, Altimate/FFMS "is a modern Oracle-based, production-ready, low cost, federal [financial management system] solution, without the high price tag of Oracle Federal Financials," AR 5437.

Health Affairs ("OHA"), and the Office of the Secretary and Under Secretary for Management ("DHS Management").[4]

- Oracle's software system (Oracle Federal Financials) is used by the United States Coast Guard ("Coast Guard" or "USCG"), the Transportation Security Administration ("TSA"), the United States Secret Service ("Secret Service"), and the Domestic Nuclear Detection Office ("DNDO").

- SAP's software system (MySAP Enterprise Resource Planning) is used by United States Customs and Border Protection ("CBP").

- Digital Systems Group, Inc.'s software system (Integrated Financial Management Information Systems) is used by the Federal Emergency Management Administration ("FEMA").

- CGI Group Inc.'s software system (Momentum) is used by the Federal Law Enforcement Training Center ("FLETC"), the Office of Intelligence and Analysis ("I&A"), and the Office of Operations Coordination ("OPS").

Id.

## 2.  The Policy Underlying DHS's Current Efforts to Modernize Its Financial Management Software Systems

Over the previous decade, DHS twice attempted to implement a department-wide update of its financial management software systems.  Id. at 8549.  Those attempts were unsuccessful, leading DHS to conclude that a department-wide modernization effort was not viable.  Id.  Consequently, as reflected in a September 21, 2011 memorandum, DHS decided to modernize its financial management software systems on a decentralized, component-by-component basis.  Id.  DHS's Office of the Chief Financial Officer was to oversee the components' modernization efforts, and no funds could be expended on modernization until an analysis of alternatives was presented to DHS's Management Directorate for approval.  Id. at 8549-50.  DHS also indicated that it would "require that all financial system modernizations or upgrade projects deliver core accounting functionality within 18 to 24 months . . . ."  Id. at 8549; accord id. at 995 (noting, in a September 5, 2013 DHS Acquisition Decision Memorandum titled "Financial System Modernization," that each modernization effort "[m]ust . . . deliver core accounting functionality with[in] 18-24 months of initiation").

---

[4]  As of July 2012, plaintiff's financial management software system was also used by United States Visitor and Immigrant Status Indicator Technology ("USVISIT").  AR 176, 195. However, in 2013, before plaintiff filed this bid protest, USVISIT became the Office of Biometric Identity Management, and is now a part of NPPD.  Fifth Bobich Decl. ¶ 7.

DHS's third attempt to modernize its financial management software systems was informed, in part, by the policies and guidance of the Office of Management and Budget ("OMB").  For example, in the then-effective version of Circular No. A-127, pertaining to financial management systems, OMB required executive agencies to consider the use of a federal shared service provider ("FSSP") when upgrading or modernizing their financial management software systems:

> 7.  Service Provider Requirements
>
>    A.  Use of External Providers
>
>    When upgrading to the next major release of its current core financial system or modernizing to a different core financial system, an agency must use an external provider which is either [an FSSP] that has been designated by OMB or a commercial vendor.  . . .
>
>    . . . .
>
>    C.  Competitive Process
>
>    Agencies are required to hold a competition among the OMB designated Federal providers and commercial vendors when upgrading their current core financial system or modernizing to a different core financial system.
>
>    D.  Competition Exemption
>
>    Agencies may be allowed to conduct a non-competitive migration or a competitive migration involving only commercial providers (if authorized by law) or OMB designated providers if they prepare a full justification, generally including the type of information called for by section 6.303-2 of the Federal Acquisition Regulation [("FAR")].  The justification shall be approved by the agency's Chief Financial Officer, Chief Information Officer, and Chief Acquisition [O]fficer.  Agencies shall confer with OMB prior to proceeding with a migration that is noncompetitive or is otherwise limited in accordance with this paragraph.  . . .  The justification shall be documented in the same general manner prescribed in Part 6 of the FAR for the use of other than full and open competition.

Id. at 64-65; see also id. at 999, 1006-07 (rescinding OMB Circular No. A-127, effective October 1, 2013, and noting that the "requirements for selecting a service provider" were removed "[t]o narrow the scope" of the document).  In addition, in Memorandum M-10-26, issued on June 28, 2010, and titled "Immediate Review of Financial Systems IT Projects," OMB suggested that the duration of financial management software system modernization projects "should not exceed 24

months," id. at 2, and further indicated its support for the use of shared service providers ("SSPs"):

> • Shared Services.  OMB supports shared service arrangements when cost effective, but will no longer mandate them in all cases for financial management systems.  Past attempts to mandate use of financial management shared services yielded inconsistent results, as medium and large agencies encountered the same types of costs and risks with a shared service provider as they did when modernizing "in house."  . . .
>
> OMB expects the requirements to re-scope agency modernization projects contained in this guidance will enable greater adoption of shared service arrangements with lower risk and greater cost impacts.

Id. at 4-5.  However, two years later, in a document titled "Federal Information Technology Shared Services Strategy," OMB indicated that under its "Shared-First" strategy, executive agencies were "require[d] . . . to use a shared approach to [information technology] service delivery."  OAR 3520.

With the OMB guidance as a backdrop, DHS began to develop its own financial management software system modernization policies.  See, e.g., AR 357, 361 (explaining, in an October 2012 "Financial Systems Modernization Playbook," that DHS's financial system modernization initiative "conform[ed] to OMB's objective to leverage shared services where possible").  For example, DHS's Office of the Chief Financial Officer published a document titled "DHS Approach to Financial Systems Modernization."  Id. at 176, 179.  According to the July 2012 version of the document, id. at 176, a DHS component choosing to modernize its financial management software system was required to prepare an analysis of its alternatives, and have its analysis approved by DHS, before proceeding.  Id. at 199.

While DHS was establishing its policies, OMB continued to provide guidance to executive agencies.  In March 2013, OMB issued Memorandum M-13-08, "Improving Financial Systems Through Shared Services," in which it "direct[ed] all executive agencies to use, with limited exceptions, a shared service solution for future modernizations" of their financial management software systems.  Id.  It explained:

> [T]o leverage existing investments and infrastructure at FSSPs, agencies must consider, as part of their alternatives analysis, the use of a[n] FSSP with respect to all new agency proposals for core accounting and mixed system upgrades. Analysis should not be limited only to an evaluation of commercial SSPs [("CSSPs")].  Instead, the preferred approach is for an agency to evaluate solutions offered by both FSSPs and [CSSPs] as part of a robust market research process.  As part of their market research, agencies may find that FSSPs have a good track record of successfully servicing Federal agencies and can provide

many of the advantages of [CSSPs] through their existing partnerships with private vendors.  To determine the best value source, each agency is expected to develop an appropriately detailed alternatives analysis of SSP solutions based on their needs, risk performance and cost.

OMB's guiding principle will be to support plans that offer the best value for the Federal Government.  OMB will consider funding the use of [CSSPs] as an appropriate solution if, after reviewing the available [FSSP] and [CSSP] solutions and using standard requirements, the agency's business case demonstrates that a [CSSP] can provide a better value for the Federal Government.  In addition, agency-specific approaches are discouraged and will be considered for funding only in the rare situation in which an agency demonstrates, through its alternatives analysis, that exceptional circumstances exist (e.g., legitimately unique agency requirements or adequate scale within the organization) that make the agency-specific approach clearly preferable to an SSP solution with respect to what is the best value for the Federal Government.

Id. at 755-56.  OMB also noted that the Office of Financial Innovation and Transformation ("FIT") at the United States Department of the Treasury would "play a significant role in evaluating agency financial system modernization investments when they are proposed and will provide recommendations to OMB on whether agency systems strategies and modernization requests align with the government-wide shared service approach."  Id. at 757.

Less than one year later, in January 2014, FIT issued its own guidance regarding the modernization of financial management software systems:  "FIT Agency Modernization Evaluation (FAME) Process, Guidance and Artifacts."  Id. at 4324-89.  In this document, FIT explained that its "primary responsibilities include[d] establishing a strategy and framework for agency migration to a shared services model, evaluating new agency proposals and monitoring the status of agency migrations."  Id. at 4328.  The FIT Agency Modernization Evaluation ("FAME") process was created to assist FIT's performance of its responsibilities.  Id.  The FAME process includes four phases:  (1) identification of needs, (2) assessment, (3) discovery, and (4) implementation.  Id. at 4330-31.  During the first phase, an agency is expected to "submit or update an Agency Modernization Plan" each year that "outline[s] the agency's business case and expected [time frame] for modernization"; the plan is submitted to FIT, which then sends a recommendation to OMB for approval.  Id. at 4336.  If modernization is appropriate, an agency moves to the second phase "to identify a preferred FSSP that most closely meets its modernization needs"; both FIT and OMB must approve the selected FSSP prior to the agency advancing to the third phase, discovery.  Id. at 4342; see also id. at 1359 ("While the FAME process is geared to [FSSPs], any consideration regarding use of a [CSSP] would also have to be coordinated with FIT and OMB.").  Once the agency has received the necessary approval, it must execute an interagency agreement with the FSSP that addresses, among other things, the cost of the discovery process.  Id. at 4347.  Once the agreement is approved by FIT, "the agency and the FSSP engage in identifying the gaps and process differences to ensure the FSSP will be able to

provide the services requested, including plans to close the gaps and begin planning for the Implementation Phase."  Id.  At the end of the discovery phase, the agency and the FSSP prepare a report with a recommendation for implementation, which both FIT and OMB must approve. Id.  If all interested parties are in agreement, the agency and the FSSP continue to the fourth phase, implementation.  Id. at 4353.  During this phase, the agency and the FSSP execute another interagency agreement "for implementation of the FSSP products and services required by the agency."  Id.  This interagency agreement, which is reviewed by FIT, includes a statement of work, a period of performance, terms and conditions, and the cost of implementation.  Id. Implementation then proceeds in accordance with the interagency agreement, with FIT's oversight.  Id.

DHS's acquisition process, the Acquisition Lifecycle Framework, is similar to the FAME process.  See Dep't of Homeland Sec., Directive 102-01, Acquisition Management Directive § V.A.1 (2010), cited in First Bobich Decl. ¶¶ 3-4; cf. AR 995 (requiring DHS components to comply with the DHS acquisition process when modernizing financial management software systems).  In particular, DHS's process contains the following four phases:

    i.  Need:  identifying the need to be addressed by the acquisition;

    ii.  Analyze/Select:  analyzing the alternatives to satisfy the need and selecting the best option;

    iii.  Obtain:  developing, testing, and evaluating the selected option and determining whether to approve production; and,

    iv.  Produce/Deploy/Support:  producing and deploying the selected option and supporting it throughout the operational lifecycle.

Directive 102-01, § V.A.1.  Advancement to each subsequent phase must be approved by a designated DHS official.  Id. §§ V.A.1, VI, VII.A.

With respect to the modernization of financial management software systems, DHS has established procedures that it believes comply with the FAME process and its own acquisition process.  First Bobich Decl. ¶¶ 3-4; see also AR 1281-83, 1348-50 (describing the various frameworks applicable to financial management software system modernization).  A DHS component that is prepared to modernize its financial management software system first analyzes its alternatives.  AR 1375.  The modernization approaches to be analyzed include use of an FSSP, use of a DHS SSP, use of a CSSP, and a component-specific approach.  Id. at 555.  Using information obtained during its analysis, the DHS component must decide "whether a[n] SSP approach is the most appropriate and, if so, whether a CSSP or FSSP is preferred."  Id. at 1375. If the DHS component selects an SSP approach, it then prepares an alternatives analysis to support its decision.  Id. at 1375, 1382; see also First Bobich Decl. ¶ 6 (indicating that the component will recommend proceeding with either an FSSP or a CSSP).  The alternatives

analysis "is recognized by DHS as the main document that identifies alternat[ive] solutions and analyzes/compares alternative acquisition approaches or products based on cost, risk and capability." First Bobich Decl. ¶ 4. The alternatives analysis must be approved by the Component Acquisition Executive and the chair of DHS's Financial Systems Modernization Executive Steering Committee ("Executive Steering Committee"). Id. ¶ 6; AR 1382; see also AR 541 (noting that the chair of the Executive Steering Committee is DHS's Chief Financial Officer).

If a DHS component obtains approval to proceed with a CSSP or a component-specific approach, it must then choose the appropriate procurement method, prepare an acquisition plan, and conduct the procurement. AR 557. If a DHS component obtains approval to proceed with an FSSP, it selects a discovery partner from the list of FSSPs preapproved by FIT and obtains the approval of its selected partner from FIT and OMB. Id. at 1382; First Bobich Decl. ¶ 7. Prior to entering the discovery phase, the DHS component and the approved FSSP execute an interagency agreement, AR 556, 1376, which must be approved by OMB and the Executive Steering Committee, id. at 1382. The purpose of the discovery phase is to ascertain the ability of the FSSP to meet the DHS component's requirements. First Bobich Decl. ¶ 8. At the conclusion of the discovery phase, the DHS component and the FSSP jointly decide whether to proceed with implementation; their decision is documented in a discovery report. Id.; AR 1376, 1381. If they decide to proceed with implementation, they must obtain the approval of FIT and OMB. AR 1381; First Bobich Decl. ¶ 8. Once OMB has given its approval, the DHS component seeks "final approval to implement with a new solution or service provider" from the DHS Acquisition Review Board. First Bobich Decl. ¶ 9; accord AR 1381. With this final approval, the DHS component and the DHS Office of the Chief Financial Officer can proceed with implementation. First Bobich Decl. ¶ 9. The DHS component and the approved FSSP execute an interagency agreement for implementation. AR 1377, 1381. This interagency agreement must be approved by OMB and DHS's Under Secretary for Management. Id. at 1381.

### 3. DHS's Current Efforts to Modernize Its Financial Management Software Systems

In line with DHS's decentralized approach to modernizing its financial management software systems, its components are in various phases of the modernization process. These efforts are addressed below.

### a. DHS Components That Acquire Their Financial Management Software Systems From ICE

ICE obtains its financial management software system and related services from plaintiff. First Bobich Decl. ¶ 2; Second Bobich Decl. ¶ 4. Other DHS components, including USCIS, NPPD, S&T, OHA, and DHS Management, obtain their financial management software systems

and related services from ICE.[5]  AR 1341.  Due to the proprietary nature of plaintiff's software system, only plaintiff can provide support to ICE and its customers.  Second Bobich Decl. ¶ 4.

Defendant has represented to the court that ICE and its customers are in various phases of the modernization process, as follows:

- ICE:  As of February 10, 2015, ICE anticipated completing its alternatives analysis within eighteen months.  Fourth Bobich Decl. ¶ 3.  As of July 24, 2015, ICE was "working on refreshing [its] market research," and had not started work on an alternatives analysis.  Fifth Bobich Decl. ¶ 8.

- OHA:  As of July 24, 2015, OHA planned to use the solution selected by ICE and was not working on an alternatives analysis.  Fifth Bobich Decl. ¶ 4.

- S&T:  S&T has completed its alternatives analysis and received the approval of the Executive Steering Committee.  Fifth Bobich Decl. ¶ 5.  On June 25, 2015, FIT notified OMB of its recommendation that S&T be permitted to proceed in the discovery phase with an FSSP–the United States Department of Agriculture's National Finance Center.  Id.  As of July 24, 2015, S&T and the National Finance Center had not executed an interagency agreement for discovery.  Id. ¶ 6.

- DHS Management:  DHS Management completed its alternatives analysis on March 19, 2015.  DA 56.  Its alternatives analysis contained the following recommendation:  "As demonstrated in the value analysis, a CSSP would not provide significantly better value than a[n] FSSP.  In fact, the FSSP alternative was determined to provide a better value.  Therefore, the FSSP alternative is recommended . . . ."  Id. at 103.  The chair of the Executive Steering Committee approved the alternatives analysis on March 26, 2015.  Id. at 58, 112.  On June 25, 2015, FIT notified OMB of its recommendation that DHS Management be permitted to proceed in the discovery phase with the National Finance Center.  Fifth Bobich Decl. ¶ 5.  As of July 24, 2015, DHS Management and the National Finance Center had not executed an interagency agreement for discovery.  Id. ¶ 6.

---

[5]  Plaintiff contends in its amended complaint that USVISIT also obtains its financial management software system and related services–supplied by plaintiff–from ICE.  Am. Compl. ¶¶ 5, 7.  However, as noted above, USVISIT was replaced by the Office of Biometric Identity Management in 2013, and the new office is part of NPPD.  Supra note 4.  Defendant represents that the new office will not independently be seeking to modernize its financial management software system.  Fifth Bobich Decl. ¶ 7.

- NPPD:  NPPD completed its alternatives analysis on April 1, 2015.  DA 113.
  Its alternatives analysis contained the following recommendation:  "While the
  results showed that each alternative was feasible for implementation . . . , the
  [FSSP] alternative resulted in lower risk and lower cost, especially in
  sustainment, from the evaluated results.  Therefore, [NPPD] concludes that the
  [FSSP] is the preferred best alternative . . . .  [It is recommended that] NPPD
  pursue an FSSP solution . . . ."  Id. at 170.  The Executive Steering Committee
  approved NPPD's alternatives analysis.  Fifth Bobich Decl. ¶ 5.  On June 25,
  2015, FIT notified OMB of its recommendation that NPPD be permitted to
  proceed in the discovery phase with the National Finance Center.  Id.  As of
  July 24, 2015, NPPD and the National Finance Center had not executed an
  interagency agreement for discovery.  Id. ¶ 6.

- USCIS:  USCIS has completed its alternatives analysis and received the
  approval of the Executive Steering Committee.  Id. ¶ 5.  On June 25, 2015,
  FIT notified OMB of its recommendation that USCIS be permitted to proceed
  in the discovery phase with the National Finance Center.  Id.  As of July 24,
  2015, USCIS and the National Finance Center had not executed an
  interagency agreement for discovery.  Id. ¶ 6.

### b.  DHS Components That Acquire Their Financial Management Software Systems From the Coast Guard

In contrast to ICE and its customers, the Coast Guard uses the Core Accounting System ("CAS")–a  highly customized version of Oracle Federal Financials–as its primary financial management software system.  AR 4837.  Two other DHS components, TSA and DNDO, obtain their financial management software systems and related services from the Coast Guard.  Id. at 1341.  Greater detail regarding the modernization efforts of the Coast Guard, TSA, and DNDO follows.

### i.  Alternatives Analyses and Selections of an Alternative

The Coast Guard initiated its financial management software system modernization effort to address significant weaknesses associated with CAS.  Id. at 4837, 4884-85.  In a January 23, 2012 alternatives analysis, the Coast Guard evaluated three alternatives, all under the assumption that TSA and DNDO would remain its customers:  (1) fixing the existing version of CAS, (2) upgrading to a new version of CAS using Oracle Federal Financials or another commercial-off-the-shelf product (hosting the system internally), and (3) migrating to an SSP.  Id. at 4880, 4889, 4898, 4906, 4913.  Based on its analysis, the Coast Guard concluded:

> Alternative 2 has surfaced with the highest overall Value Score, lowest Risk
> Score, and lowest Life Cycle Cost Estimate.  Alternative 3 was close in its Value
> Score with Alternative 2, but significantly higher in Risk Score and Life Cycle

> Cost Estimate.  Alternative 1 was measurably lower in it[s] Value Score
> alignment, higher in its Risk Score, and much higher in its overall Life Cycle Cost
> Estimate when compared to Alternative 2.

Id. at 4881.  The Coast Guard proceeded to evaluate the second and third alternatives in more detail, and in a November 9, 2012 document titled "CAS Replacement Project Team Course of Action," concluded that the second alternative "provided slightly lower risk and slightly higher value relative to the" third alternative.  Id. at 4847, 4849; see also id. at 4838 ("The evaluation of the Risk and Value selection criteria indicates that the two [courses of action] are equal.").  In that same document, the Coast Guard compared the cost of hosting the financial management software system internally with the cost of an SSP hosting the system.  Id. at 4849-51.  To make this comparison, it obtained Rough Orders of Magnitude ("ROMs") from the United States Department of the Interior's Interior Business Center, the United States Department of Transportation, and its own Operations Systems Center.  Id. at 4842-43.  The Coast Guard concluded:  "The evaluation of ROMs also indicates that the two [courses of action] are equal. [The Interior Business Center] indicates that additional savings would be realized if DNDO, TSA, and [the Coast Guard] enter a collective inter-agency agreement."  Id. at 4838.  Although the Coast Guard only considered ROMs from FSSPs, it recognized that both FSSPs and CSSPs would be considered if the SSP course of action was selected.  Id. at 4852.  In fact, as reflected in a November 28, 2012 decision memorandum, the Coast Guard chose the third alternative–migration of its financial management software system to an SSP.  Id. at 5051-54.

TSA issued its alternatives analysis to replace CAS in February 2013.  Id. at 2355.  TSA analyzed three alternatives:  (1) use of an FSSP, (2) use of a CSSP, and (3) use of a DHS data center with TSA contractor support.  Id. at 2361.  To assist in its analysis, TSA sought information from two FSSPs (the Interior Business Center and the United States Department of Transportation) and two commercial entities offering Software as a Service.  Id. at 2373, 2377.  Upon analyzing the information it had gathered, TSA determined that cost had "minimal significance in determining the value of the three alternatives," and accordingly focused on risk and measures of operational effectiveness ("MOE").  Id. at 2362.  TSA concluded:

> [A]lthough the MOE and risk ratings of CSSP show it to be the best value for the
> Government, the rating variances between CSSP and FSSP are not sufficient
> enough to exclude FSSP for further consideration.  Therefore, [it is recommended
> that TSA] conduct[] a competitive procurement in which both Federal and
> Commercial sources submit priced proposals to meet the CAS specific hosting
> requirements and that TSA select[] the best source based on the proposals
> received.

Id. at 2383; accord id. at 2362; see also id. at 3856 (making this same recommendation in a March 20, 2013 presentation to DHS's Asset Management Executive Steering Committee). However, after issuing its alternatives analysis, but prior to April 10, 2013, TSA determined that

it could not use a CSSP.[6]  Id. at 4062, 4069, 4084.  Accordingly, TSA decided to migrate to an FSSP.  Id. at 4069, 4084, 4145.  Then, once it obtained the necessary approvals of that decision, id. at 4100, it would, pursuant to OMB Circular No. A-127, either prepare its own justification supporting its decision to forgo competition and migrate to an FSSP, or join a DHS-sponsored justification with the Coast Guard and DNDO, id. at 4085, 4105, 4109.  TSA obtained approval for its chosen modernization approach from its Component Acquisition Executive on April 9, 2013, id. at 4227, and from the Executive Steering Committee on May 30, 2013, id. at 2353; see also id. (stating that TSA concluded in its alternatives analysis "that use of a[n SSP] is the lower cost, lower risk option and, based on the value analysis, a [CSSP] did not provide significantly better value than [an FSSP]"); cf. id. at 8553 (reflecting that the Executive Steering Committee approved TSA's business case).

DNDO issued its alternatives analysis on June 10, 2013.[7]  Id. at 2623.  It analyzed three alternatives:  (1) use of an FSSP with accounting operations, (2) use of an FSSP without accounting operations, and (3) use of a commercial services provider.  Id. at 2629-30.  To assist in its analysis, DNDO sought information from eight federal and commercial business centers. Id. at 2636.  Upon analyzing the information it had gathered, DNDO concluded that the second alternative was the preferred alternative because it ranked highest on two of the three decision criteria (risk and operational effectiveness).  Id. at 2672-73.  The Executive Steering Committee approved DNDO's alternatives analysis on July 25, 2013.  Id. at 2619, 5597; see also id. at 2619 (characterizing the conclusion reached by DNDO in its alternatives analysis as:  "use of a[n SSP] is the lower cost, lower risk option and, based on the market research results, a [CSSP] did not provide significantly better value than a[n FSSP]"); cf. id. at 5596 (reflecting that the Executive Steering Committee approved DNDO's business case).  DNDO's Component Acquisition Executive approved the alternatives analysis on August 13, 2013.  Id. at 2621.

While TSA and DNDO were finalizing and seeking approval of their alternatives analyses, the Coast Guard decided to seek information from commercial vendors regarding the provision of financial management software systems and related services to improve its knowledge of the CSSP market.  Id. at 761, 5604.  Specifically, on May 16, 2013, the Coast Guard issued a Request for Information to "identify possible available sources able to provide a Financial Management System (FMS) Software as a Service" and related support.  Id. at 5120.

---

[6]  TSA indicated that it was advised by its Office of Chief Counsel that it could not use a CSSP "[d]ue to A76," AR 4084, which appears to refer to OMB Circular No. A-76, "Performance of Commercial Activities," dated May 29, 2003.  The reference may be a typographical error; elsewhere TSA indicated that its decision to migrate to an FSSP aligned with a "recent OMB memo"–Memorandum M-13-08, dated March 25, 2013–because it had concluded in its alternatives analysis that "commercial is not significantly better than Federal SSP."  Id. at 4084-85; accord id. at 4145.

[7]  Although the alternatives analysis was prepared by a contractor, AR 2628, the court will refer to DNDO as the document's author.

Eleven commercial entities, including plaintiff's parent company, Savantage Solutions, responded to the Coast Guard's request.[8]   See generally id. at 5133-57, 5175-391, 5396-457. Seven respondents "provided information on services that approached the level of service outlined by the requirements."  Id. at 5473.  However, the Coast Guard determined that an "[a]nalysis of the submitted information indicate[d] a lack of maturity in the Federal Management [CSSP] market, particularly in the [financial management Software as a Service]-to-government market."  Id.

After the Coast Guard reviewed the responses to its Request for Information, it sought supplemental information from the Interior Business Center.  Id. at 5458, 5579.  It did not request such information from the three other FSSPs because they lacked the capability to serve the Coast Guard's needs.  Id. at 5579.  The Interior Business Center responded on June 10, 2013.  Id. at 5459-66.

It is apparent that by July 3, 2013, the Coast Guard, TSA, and DNDO decided to proceed with a combined justification in support of their independent decisions to forgo competition and migrate to an FSSP.  On that date, the Coast Guard submitted to the Executive Steering Committee a "Justification for Competition Exemption" ("A-127 Justification").  Id. at 5580-84. In that memorandum, the Coast Guard discussed the reason for pursuing financial management software system modernization, the alternatives analyses conducted by the three DHS components, its market research, the conclusions drawn from the market research, and the rationale for choosing an FSSP.  Id. at 5581-84.  It concluded:

> Pursuant to the OMB Circular No. A-127 Section 7.D Competition Exemption, agencies may be allowed to conduct a non-competitive migration.  Based on the collective market research and consideration of schedule, cost and performance risks outlined above, it is determined that a[n] FSSP will be used to migrate USCG/TSA/DNDO [financial management systems].

Id. at 5584.  Ultimately, in accordance with section 7.D of OMB Circular No. A-127, this conclusion was endorsed by the Chief Financial Officers, Chief Information Officers, and Chief

---

[8]  The other commercial respondents included Accenture Federal Services LLC, AR 230; APG Intel, LLC, a CACI Company ("APG Intel"), id. at 5175; CGI Federal Inc., id. at 5196; Computer Sciences Corporation, id. at 5291; Deloitte Consulting, LLP, id. at 5313; Digital Systems Group, Inc., id. at 5321; Global Computer Enterprises, Inc., id. at 5367; IBM U.S. Federal, id. at 5396; NEW WORLD APPS, Inc., id. at 5420; and SAP National Security Services, id. at 5430.

Acquisition Officers of the Coast Guard, TSA, and DNDO.[9]  Id. at 984, 988; see also id. at 5591-92 (TSA's concurrence).

Meanwhile, on July 11, 2013, the Coast Guard issued its business case for financial management software system modernization.  Id. at 2597-618.  In that document, the Coast Guard examined its alternatives analyses, the alternatives analyses prepared by TSA and DNDO, and its market research.  Id.  Based on that information, the Coast Guard "concluded that a

---

[9]  Plaintiff asserts that "DNDO never approved, or concurred with," the A-127 Justification, based on the fact that the administrative record does not contain any documents generated by DNDO reflecting its approval or concurrence.  Pl.'s Mot. for J. on the AR 19.  While the administrative record may not contain primary evidence of DNDO's approval or concurrence, it does contain secondary evidence:

- FIT's representation to OMB that DNDO's Chief Financial Officer, Chief Information Officer, and Chief Acquisition Officer "approved this migration in accordance with OMB Circular A-127, Section 7.D," AR 988; cf. id. at 989 (indicating that DHS officials were provided copies of the document containing this representation);

- DHS's representation that "DHS and USCG/TSA/DNDO have approved the justification required by OMB Circular A-127 to migrate the USCG/TSA/DNDO financial system to [an FSSP]," id. at 2677; and

- DNDO's Chief Financial Officer's representation to FIT on July 25, 2013, that DNDO was "ready to begin the Discovery Phase," id. at 3408, 3417-18.

It is highly unlikely that FIT and DHS would have represented that the DHS components had complied with section 7.D of OMB Circular No. A-127 had the representation not been true, or that DNDO's Chief Financial Officer would have indicated that DNDO was ready to proceed with discovery had he not previously given his approval in accordance with section 7.D of OMB Circular No. A-127.  Indeed, FIT, DHS, and DNDO's Chief Financial Officer are entitled to the presumption that their representations were accurate and that they complied with the applicable statutes and regulations.  See U.S. Postal Serv. v. Gregory, 534 U.S. 1, 10 (2001) (noting that "a presumption of regularity attaches to the actions of Government agencies"); Schism v. United States, 316 F.3d 1259, 1302 (Fed. Cir. 2002) (en banc) ("This presumption of regularity is the supposition that public officers perform their duties correctly, fairly, in good faith, and in accordance with law and governing regulations, and is valid and binding unless 'well-nigh irrefragable proof rebuts or overcomes it.'" (citation omitted) (quoting Alaska Airlines, Inc. v. Johnson, 8 F.3d 791, 795 (Fed. Cir. 1993))).  Plaintiff has not identified any evidence, either within or outside of the administrative record, suggesting that DNDO did not approve or concur with the A-127 Justification.  Accordingly, the court finds that DNDO approved the A-127 Justification.

transition to a[n] FSSP was the best course of action to address [financial management system] deficiencies and was in the best interest of the government." Id. at 2599.  Then, on July 17, 2013, the Coast Guard issued an updated alternatives analysis that incorporated its findings from TSA's and DNDO's alternatives analyses and its market research.  Id. at 5585-89.  The conclusion it reached was nearly identical to the conclusion set forth in its business case:  "As a result of its multiple analysis efforts described above, . . . an interagency acquisition to transition to a[n] FSSP is the best course of action to address [financial management system] deficiencies and is in the best interest of the government."  Id. at 5589.  The Executive Steering Committee approved the Coast Guard's business case and/or course of action on July 25, 2013.  Id. at 5596-97; accord id. at 5628 (containing the assertion of DHS's Chief Financial Officer that the Coast Guard "has concluded that use of [an SSP] is the lower cost, lower risk option and, based on the market research results, a [CSSP] did not provide significantly better value than [an FSSP]").

As reflected in an August 16, 2013 memorandum, FIT approved the decisions of the Coast Guard, TSA, and DNDO to migrate their financial management software systems to an FSSP, as well as their decisions to enter the discovery phase with the Interior Business Center. Id. at 4265.  On that same date, OMB indicated that it had no objections to the DHS components' entry into the discovery phase with an FSSP.  Id. at 4264.

### ii.  Discovery

Prior to the Coast Guard, TSA, and DNDO obtaining the necessary approvals to proceed to the discovery phase, they began meeting with the Interior Business Center to discuss the discovery process.  Id. at 952-55.  Once they obtained these approvals, DHS executed two documents in support of its intent to enter into an interagency agreement with the Interior Business Center to enable the Coast Guard, TSA, and DNDO to engage in the discovery process: a "Determination of Best Procurement Approach" pursuant to FAR 17.502-1, id. at 2677-81, and a "Determination and Findings" ("D&F") in support of the execution of an interagency agreement pursuant to the Economy Act, id. at 2683-85.  In both documents, DHS indicated that the Interior Business Center "uses a combination of federal employees and commercial contractors to complete the 'Discovery' process" and that "[t]he commercial contractor portion of this requirement will be provided through a task order issued under existing [Interior Business Center] contracts . . . ."[10]  Id. at 2677-78, 2683.  DHS further stated in the D&F that "[t]he

---

[10]  Notwithstanding the stated intent to issue a task order, the evidence in the administrative record reflects that the Interior Business Center ordered services from its contractor using contract line items–labeled "tasks"–enumerated in a bridge contract and in modifications of that bridge contract.  See AR 7144-51 (containing the bridge contract's schedule of supplies and services), 7534-38 (containing the schedule of supplies and services in modification 0001 of the bridge contract), 7574-77 (containing the schedule of supplies and services in modification 0002 of the bridge contract), 7599-600 (containing the schedule of supplies and services in modification 0003 of the bridge contract).  Indeed, the bridge contract was not referred to as a task order contract, but as a contract with "Firm Fixed Price and Labor

acquisition [would] appropriately be made under an existing contract of the [Interior Business Center], entered into before placement of the order, to meet the requirement of the [Interior Business Center] for the same or similar supplies or services." Id. at 2683.

DHS executed the "Determination of Best Procurement Approach" and the D&F on September 9, 2013. Id. at 2679, 2684. On that same date, DHS and the Interior Business Center executed an interagency agreement for the discovery phase pursuant to the Economy Act. Id. at 2687-89. The agreement incorporated a Statement of Work that described the work to be performed by the Interior Business Center as: presenting to the Coast Guard, TSA, and DNDO the services it provides; reviewing and defining the requirements of the Coast Guard, TSA, and DNDO; analyzing the gaps between the services and requirements; and recommending a solution by which it could meet the needs of the Coast Guard, TSA, and DNDO. Id. at 2708. The total amount of the agreement was $2,995,000; of that amount, $2,055,000 was set aside for "[c]ontractor support for discovery phase services," $880,000 was set aside for "[f]ederal support for discovery phase services," and the remaining $60,000 was set aside for travel. Id. at 2689.

Prior to the execution of the interagency agreement, the Interior Business Center had a contract with APG Intel under which APG Intel was required to, among other things, perform discovery activities for the Interior Business Center's clients. Id. at 7130. This contract expired on July 31, 2013, while the Interior Business Center was recompeting the requirement. Id. Because it was necessary for the Interior Business Center to provide discovery-related services in the interim, it awarded APG Intel a bridge contract on September 11, 2013, with an effective date of September 25, 2013. Id. at 7144. In the bridge contract, the parties identified eleven agencies for which APG Intel's services might be required, along with not-to-exceed pricing for each agency. Id. at 7153-54. However, upon the execution of the bridge contract, the Interior Business Center only ordered services for three of those agencies. Id. at 7150-51. Specifically, the bridge contract's schedule of supplies and services included the following three line items: (1) "Task 3-1 TSA Discovery Phase of Implementation," (2) "Task 3-2 DNDO Discovery Phase of Implementation," and (3) "Task 3-3 USCG Discovery Phase of Implementation." Id. The bridge contract's period of performance was three months, with four three-month option periods. Id. at 7155. The total award amount of the bridge contract was $655,188.30, id. at 7144, but if the Interior Business Center exercised all of the options, the total cost to the government would be $56,043,015.17, id. at 7153; cf. id. at 7534-36 (modifying the bridge contract to increase funding for the discovery phase tasks from $30,000 to $2,031,193.18), 7574 (modifying the bridge contract to increase funding for the discovery phase tasks by $87,384.03).

The discovery phase officially spanned from September 2013 to September 2014. Id. at 7599. In the discovery report, which was issued on July 15, 2014, id. at 2038, the Coast Guard,

---

Hour line items (Hybrid) distinguished by task assignment as identified in [the Performance Work Statement]." Id. at 7171; accord id. at 7153 ("This contract will be issued as a Hybrid Contract, with Firm Fixed Price Line Items, and Labor Hour Line [Items] as distinguished by task assignment as identified in the attached [Performance Work Statement].").

TSA, and DNDO recommended proceeding with the Interior Business Center as their FSSP for financial management software systems, "provided the risks outlined in [the report were] fully understood and their mitigation plans [were] fully supported by all signatories and key stakeholders." Id. at 2047. The discovery report was approved by the Coast Guard, TSA, DNDO, and DHS. Id. at 2039-44. FIT approved the report on August 18, 2014, id. at 2044, and OMB indicated its approval on August 22, 2014, id. at 1708.

### iii. Implementation

In anticipation of receiving the necessary approvals, DHS and the Interior Business Center began laying the groundwork for implementation. For example, in May 2014, DHS provided the Interior Business Center with a performance work statement and the Interior Business Center supplied DHS with its projected schedule and estimated costs. Id. at 8747; see also id. at 8750 (noting estimated costs of $79.9 million), 8751 (reflecting that DNDO would "go live" in October 2015, TSA would "go live" in October 2016, and the Coast Guard would "go live" in October 2017).

DHS and the Interior Business Center also engaged in discussions regarding the technical requirements of the interagency agreement for the implementation phase. See, e.g., id. at 1824-25 (summarizing the discussion concerning development of an acquisition plan); id. at 1830 (addressing the statutory authority that the Interior Business Center uses for its interagency agreements). Of particular note, they agreed that the interagency agreement would be issued under the authority of the Government Management Reform Act of 1994, and not the Economy Act. Id. at 1705, 1830, 2014. They further agreed that the interagency agreement would not be for a direct acquisition or an assisted acquisition. Id. at 1830, 2013. Rather, the interagency agreement would be for nonacquisition assistance because the Interior Business Center would not be issuing any type of contract or task order on DHS's behalf. Id. at 1824-25, 1830, 2013.

On July 18, 2014, while DHS and the Interior Business Center were discussing the technical requirements of the interagency agreement for implementation, DHS executed, "in accordance with" the FAR, another "Determination of Best Procurement Approach." Id. at 1863-65. In that document, DHS indicated its intent to enter into an interagency agreement with the Interior Business Center, noted that the agreement would be executed under the Government Management Reform Act of 1994, and represented that executing the agreement was in the best interest of the government. Id. at 1863-64. However, DHS later determined that it was not required to execute a "Determination of Best Procurement Approach" because the FAR did not apply to nonacquisition interagency agreements such as the one it would be executing with the Interior Business Center. Id. at 2014.

On August 5, 2014, the DHS Acquisition Review Board approved the acquisition of financial management software systems from the Interior Business Center. Id. at 1449. Three days later, the Interior Business Center submitted its best and final offer to DHS. Id. at 2078. Ultimately, on August 26, 2014, DHS and the Interior Business Center executed an interagency

agreement for implementation pursuant to the Government Management Reform Act of 1994. Id. at 8504. The total amount of the agreement, if all options were exercised, was $79,218,548. Id. at 8508; accord id. at 2017. On September 3, 2014, the Interior Business Center modified its existing bridge contract with APG Intel to authorize APG Intel to assist in the implementation phase, id. at 7601, rather than ordering the work under the contract that replaced the expired contract with APG Intel, which had been awarded to i360technologies, Inc. in December 2013, id. at 8280.

### c. Other DHS Components

The record before the court contains the following limited information regarding the remaining DHS components:

- FLETC, I&A, and OPS: FLETC issued an alternatives analysis on August 9, 2013. DA 1. At that time, FLETC used a financial management software system developed by CGI Group Inc., id. at 24, and supported two customers–I&A and OPS, id. at 5, 13; AR 1341. In its alternatives analysis, FLETC concluded that it should upgrade its existing financial management software system rather than migrate to a CSSP or an FSSP. DA 5. The chair of the Executive Steering Committee approved the alternatives analysis on September 11, 2013. Id. at 49. FLETC issued a solicitation, id. at 1187, and awarded a contract for the upgrade on April 11, 2014, Sixth Bobich Decl. ¶ 5. As of August 17, 2015, I&A and OPS continued to be customers of FLETC. Id. ¶ 6. They have not independently prepared alternatives analyses or executed interagency agreements for discovery. Id.

- CBP: CBP intends to upgrade its hardware, database, and operating system beginning in August 2015. Id. ¶ 3. It has no plans to replace its financial management software. Id. FIT is aware of CBP's plans and has represented that its oversight is not necessary. Id.

- FEMA: FEMA is currently in the second phase of the FAME process, and has not yet completed an alternatives analysis or executed an interagency agreement for discovery. Id. ¶ 4.

- The Secret Service: The Secret Service has an existing contract, with a period of performance of April 2012 to April 2017, that covers technical upgrades to its financial management software system. Id. ¶ 7. It has not prepared an alternatives analysis or executed an interagency agreement for discovery. Id.

**B.  Procedural History**

Plaintiff originally lodged this bid protest on April 16, 2014.  In its complaint, it contended that OHA had obtained a new financial management software system and related services via an improper sole-source procurement, and that OHA had violated the relevant OMB requirements by failing to conduct an alternatives analysis or prepare a justification.  Plaintiff's three claims for relief all concerned OHA's modernization efforts.  After plaintiff filed its motion for judgment on the administrative record, OHA initiated corrective action by cancelling the proposed migration of its financial management software system, and proclaiming its intent to re-evaluate its options for obtaining the required services.  Defendant accordingly moved to dismiss the protest.  The court granted defendant's motion in its August 26, 2014 Opinion and Order, holding that because the claims and relief described in plaintiff's complaint pertained only to OHA's proposed migration, the corrective action described by defendant rendered plaintiff's bid protest moot.

The day after the court dismissed plaintiff's bid protest, plaintiff moved to vacate the court's decision and for leave to amend its complaint to challenge the actions that DHS and its components had taken to migrate the components' financial management software systems.  The court granted plaintiff's motion in a November 19, 2014 Opinion and Order.  Plaintiff thereafter filed an amended complaint setting forth three claims for relief, all based on its contention that DHS components, including the Coast Guard, TSA, DNDO, ICE, NPPD, and S&T, decided to acquire, or to execute agreements with SSPs to acquire, financial management software systems and related services without providing it with the opportunity to compete.  Specifically, in its first claim for relief, plaintiff contends that DHS components violated the requirement of the Competition in Contracting Act of 1984 to obtain full and open competition through the use of competitive procedures.  In its second claim for relief, plaintiff contends that DHS components violated (1) the requirements set forth in FAR subpart 6.3 that procuring agencies justify, approve, and publish notice of their use of other than full and open competition and (2) the requirements set forth in FAR subpart 17.5 regarding acquisitions through interagency agreements.  In its third claim for relief, plaintiff contends that DHS components acted arbitrarily, capriciously, with an abuse of discretion, and contrary to law.

Defendant filed the administrative record for the amended complaint on March 6, 2015.  Plaintiff subsequently filed a motion to supplement the administrative record, a motion for leave to file a second amended complaint, and a motion for judgment on the administrative record.  Defendant, in turn, filed a motion to dismiss and a cross-motion for judgment on the administrative record.  The parties have fully briefed all of the pending motions and the court heard argument on August 27, 2015.

### C.  Relevant Statutes and Regulations

Because two of plaintiff's claims for relief concern whether DHS and its components have, and are, complying with the statutes and regulations related to the use of noncompetitive acquisition procedures, a brief summary of the pertinent statutes and regulations is required.

### 1.  The Competition in Contracting Act of 1984

Under the Competition in Contracting Act of 1984, when a federal executive agency conducts a procurement for property or services, it normally must "obtain full and open competition through the use of competitive procedures in accordance with" the pertinent statutes and the FAR.  41 U.S.C. § 3301(a)(1) (2012); accord FAR 6.101 (2014).  However, an executive agency may use noncompetitive procedures in certain specified circumstances, see 41 U.S.C. § 3304(a); FAR 6.301(a); FAR 6.302, or when they are "expressly authorized by statute," 41 U.S.C. § 3301(a); accord id. § 3304(a)(5); FAR 6.302-5.

If an executive agency plans to use noncompetitive procedures, it may not do so until (1) "the contracting officer for the contract justifies the use of those procedures in writing and certifies the accuracy and completeness of the justification"; (2) if the amount of the contract exceeds $500,000, the appropriate agency official approves the justification; and (3) any required notice is published.  41 U.S.C. § 3304(e)(1); accord FAR 6.303-1; FAR 6.304.  Moreover, "[i]n no case may an executive agency . . . procure property or services from another executive agency unless the other executive agency complies with [the pertinent statutes] in its procurement of the property or services."  41 U.S.C. § 3304(e)(5)(A).

The justification required to use noncompetitive procedures must include the following information:

(1)  Identification of the agency and the contracting activity, and specific identification of the document as a "Justification for other than full and open competition."

(2)  Nature and/or description of the action being approved.

(3)  A description of the supplies or services required to meet the agency's needs (including the estimated value).

(4)  An identification of the statutory authority permitting other than full and open competition.

(5)  A demonstration that the proposed contractor's unique qualifications or the nature of the acquisition requires use of the authority cited.

(6)  A description of efforts made to ensure that offers are solicited from as many potential sources as is practicable . . . .

(7)  A determination by the contracting officer that the anticipated cost to the Government will be fair and reasonable.

(8)  A description of the market research conducted . . . and the results or a statement of the reason market research was not conducted.

(9)  Any other facts supporting the use of other than full and open competition . . . .

. . . .

(10)  A listing of the sources, if any, that expressed, in writing, an interest in the acquisition.

(11)  A statement of the actions, if any, the agency may take to remove or overcome any barriers to competition before any subsequent acquisition for the supplies or services required.

(12)  Contracting officer certification that the justification is accurate and complete to the best of the contracting officer's knowledge and belief.

FAR 6.303-2(b); accord 41 U.S.C. § 3304(e)(2).  The executive agency must, in most cases, make the justification publicly available within fourteen days of contract award.  41 U.S.C. § 3304(f)(1); FAR 6.305.

## 2.  The Economy Act

As previously noted, executive agencies can avoid obtaining full and open competition if an alternative procurement procedure is set forth in another statute.  See 41 U.S.C. § 3301(a). One such statute is the Economy Act, which provides that an agency "may place an order with a major organizational unit within the same agency or another agency for goods or services if":

(1)  amounts are available;

(2)  the head of the ordering agency or unit decides that the order is in the best interest of the United States Government;

(3)  the agency or unit to fill the order is able to provide or get by contract the ordered goods or services; and

(4)  the head of the agency decides ordered goods or services cannot be provided by contract as conveniently or cheaply by a commercial enterprise.

31 U.S.C. § 1535(a) (2012).  The FAR applies to Economy Act agreements "when one agency uses another agency's contract to obtain supplies or services," but not when "the interagency transaction does not result in a contract or an order . . . ."  FAR 17.502-2(a); <u>accord</u> FAR 17.500 (noting that FAR subpart 17.5 applies to interagency acquisitions and not to "[i]nteragency reimbursable work performed by Federal employees (other than acquisition assistance) or interagency activities where contracting is incidental to the purpose of the transaction").  If the FAR applies, an agency planning to order goods or services from another agency must first determine that "an interagency acquisition represents the best procurement approach."  FAR 17.502-1(a)(1).  That determination must include "an analysis of procurement approaches" and "an evaluation . . . that using the acquisition services of another agency (i) [s]atisfies the requesting agency's schedule, performance, and delivery requirements, (ii) [i]s cost effective, and (iii) [w]ill result in the use of funds in accordance with appropriation limitations and compliance with the requesting agency's laws and policies."  <u>Id.</u>

In addition, the requesting agency must support its order with a D&F.[11]  FAR 17.502-2(c)(1).  The D&F must contain statements affirming that the acquisition is in the government's best interest and that a commercial acquisition would be less convenient and more expensive.  <u>Id.</u>  It must also contain a statement that one of the following three circumstances applies to the acquisition:

(A)  The acquisition will appropriately be made under an existing contract of the servicing agency, entered into before placement of the order, to meet the requirements of the servicing agency for the same or similar supplies or services.

(B)  The servicing agency has the capability or expertise to enter into a contract for such supplies or services that is not available within the requesting agency.

(C)  The servicing agency is specifically authorized by law or regulation to purchase such supplies or services on behalf of other agencies.

<u>Id.</u>  The D&F must be approved by a contracting officer from the requesting agency, and it must be provided to the servicing agency with the order.  FAR 17.502-2(c)(2) to (3).

---

[11]  The relevant regulations do not appear to prevent the requesting agency from combining the determination required by FAR 17.502-1(a)(1) and the D&F required by FAR 17.502-2(c)(1) in one document.  However, it is clear that the requesting agency must comply with both regulations.  <u>See</u> FAR 17.503(a) ("Before placing an order for supplies or services with another Government agency, the requesting agency shall follow the procedures in 17.502-1 and, if under the Economy Act, also 17.502-2.").

If the interagency acquisition requires the servicing agency to award a contract, the servicing agency is responsible for complying with the FAR's competition requirements, including those for full and open competition and those for other than full and open competition. FAR 17.503(d)(3). Finally, prior to the servicing agency acquiring the goods or services for the requesting agency, the two agencies must "sign a written interagency agreement that establishes the general terms and conditions governing the relationship between the parties, including roles and responsibilities for acquisition planning, contract execution, and administration and management of the contract(s) or order(s)." FAR 17.502-1(b)(1)(i).

### 3. The Government Management Reform Act of 1994

Executive agencies may also avoid obtaining full and open competition if they proceed with the procurement under section 403 of the Government Management Reform Act of 1994. See Pub. L. No. 103-356, 108 Stat. 3410, 3413 (codified as amended at 31 U.S.C. § 501 note). That statute authorizes the establishment of franchise funds at six executive agencies. Id. § 403(a). With respect to such funds, the statute provides:

> Each such fund may provide, consistent with guidelines established by the Director of [OMB], such common administrative support services to the agency and to other agencies as the head of such agency, with the concurrence of the Director, determines can be provided more efficiently through such a fund than by other means. To provide such services, each such fund is authorized to acquire the capital equipment, automated data processing systems, and financial management and management information systems needed. Services shall be provided by such funds on a competitive basis.

Id. § 403(b). Further, "nothing in [section 403(b) is to] be construed as relieving any agency of any duty under applicable procurement laws." Id. § 403(e).

One of the franchise funds authorized by the Government Management Reform Act of 1994 was established for the use of the United States Department of the Interior. See Pub. L. No. 104-208, 110 Stat. 3009, 3009-200 to 3009-201 (1997) (codified as amended at 31 U.S.C. § 501 note). The fund is "to be available . . . for costs of capitalizing and operating administrative services as the Secretary determines may be performed more advantageously as centralized services[,]" and is to "provide services on a competitive basis[.]" Id.

### II. DEFENDANT'S MOTION TO DISMISS

As a threshold matter, defendant moves to dismiss at least some, and perhaps all, of plaintiff's claims on justiciability grounds. Specifically, defendant contends that (1) with respect to many of the DHS components, plaintiff's claims are not ripe, (2) plaintiff lacks standing to challenge the decisions of the Coast Guard, DNDO, and TSA, and (3) DHS's decision to execute agreements with the Interior Business Center to acquire financial management software systems

-23-

and related services for the Coast Guard, TSA, and DNDO is not subject to judicial review.  The court address these contentions, as well as the issue of subject matter jurisdiction, below.

## A. Subject Matter Jurisdiction

Although not directly challenged by defendant, the court must satisfy itself that it possesses subject matter jurisdiction to entertain plaintiff's claims.  Hardie v. United States, 367 F.3d 1288, 1290 (Fed. Cir. 2004).  Indeed, whether the court has jurisdiction to decide the merits of a case is a threshold matter.  Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94-95 (1998).  "Without jurisdiction the court cannot proceed at all in any cause.  Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause."  Ex parte McCardle, 74 U.S. (7 Wall.) 506, 514 (1868).

The ability of this court to hear and decide suits against the United States is limited.  "The United States, as sovereign, is immune from suit save as it consents to be sued."  United States v. Sherwood, 312 U.S. 584, 586 (1941).  The waiver of immunity "cannot be implied but must be unequivocally expressed."  United States v. King, 395 U.S. 1, 4 (1969).  The Tucker Act, the principal statute governing the jurisdiction of the United States Court of Federal Claims ("Court of Federal Claims"), waives sovereign immunity for claims against the United States in bid protests.  See 28 U.S.C. § 1491(b) (2012).  Specifically, the Tucker Act provides that the Court of Federal Claims:

> shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement . . . without regard to whether suit is instituted before or after the contract is awarded.

Id. § 1491(b)(1).

As noted above, in its amended complaint, plaintiff alleges that DHS components decided to acquire, or to execute agreements with SSPs to acquire, financial management software systems and related services without providing it with the opportunity to compete.  See Am. Compl. ¶¶ 36, 38-39, 41.  Plaintiff reiterates this allegation in the introduction of its motion for judgment on the administrative record.  See Pl.'s Mot. for J. on the AR 1 ("[The Coast Guard, TSA, and DNDO] made decisions to acquire the Oracle financial management system and related services on a sole-source basis . . . ."); accord Pl.'s Reply in Support of Its Motion for J. on the AR 1-2.  Based on the allegations in the amended complaint and plaintiff's motion for judgment on the administrative record, it is apparent that plaintiff is challenging each DHS component's decision–if such a decision has been made–to forgo competition and acquire a financial management software system and related services on a sole-source basis.  In other words,

plaintiff is challenging, at a minimum, a purported "violation of statute or regulation in connection with a procurement or proposed procurement."[12]  Accord McAfee, Inc. v. United States, 111 Fed. Cl. 696, 707 (2013) (holding that jurisdiction existed under 28 U.S.C. § 1491(b)(1) to consider the protestor's allegation that the procuring agency decided to acquire security services from a single source without competition).  Accordingly, the court possesses subject matter jurisdiction to entertain at least some of plaintiff's claims.

## B.  Ripeness

Having satisfied itself on the issue of subject matter jurisdiction, the court turns to defendant's first justiciability argument–that plaintiff's claims with respect to those DHS components that have not executed an interagency agreement with an FSSP (in other words, all DHS components other than the Coast Guard, TSA, and DNDO) are unripe.

## 1.  Legal Standard

A claim is not ripe for judicial review when it is contingent upon future events that may or may not occur.  Thomas v. Union Carbide Agric. Prods. Co., 473 U.S. 568, 580-81 (1985).  The ripeness doctrine "prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties," Abbott Labs. v. Gardner, 387 U.S. 136, 148-49 (1967), overruled on other grounds by Califano v. Sanders, 430 U.S. 99 (1977), and it derives from both "Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction," Nat'l Park Hospitality Ass'n v. Dep't of the Interior, 538 U.S. 803, 808 (2003) (citing Reno v. Catholic Soc. Servs., Inc., 509 U.S. 43, 57 n.18 (1993)).

In determining whether a claim is ripe for judicial review, courts must "evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration."  Abbott Labs., 387 U.S. at 149.  The first prong of the ripeness analysis is not satisfied unless "the challenged agency action is final."  Tokyo Kikai Seisakusho, Ltd. v. United States, 529 F.3d 1352, 1362 (Fed. Cir. 2008); accord NSK, Ltd. v. United States, 510 F.3d 1375, 1384 (Fed. Cir. 2007) (citing Abbott Labs., 387 U.S. at 149).  A final agency action displays two characteristics.  "First, the action must mark the 'consummation' of the agency's decisionmaking process–it must not be of a merely tentative or interlocutory nature."  Bennett v. Spear, 520 U.S. 154, 177-78 (1997) (citation omitted).  "[S]econd, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'"  Id. at 178 (citation omitted).  The second prong of the ripeness analysis is satisfied when the challenged agency action has an "immediate and substantial impact" on the plaintiff.  Gardner v. Toilet Goods Ass'n, 387 U.S. 167, 170 (1967); see also Sys. Application & Techs., Inc. v. United

---

[12]  The court addresses whether plaintiff has asserted viable claims under the other clauses of 28 U.S.C. § 1491(b)(1) below.

States, 691 F.3d 1374, 1385 (Fed. Cir. 2012) ("Unlike the standard for obtaining injunctive relief, which requires a showing of irreparable harm, the standard for ripeness requires a lesser showing of hardship.").

### 2.  Some of Plaintiff's Claims Are Ripe

Defendant contends that plaintiff's claims must first be parsed to determine whether each individual DHS component has completed the multistep financial management software system modernization process.[13]  Only if that process is complete, defendant asserts, can plaintiff's claims be ripe.  Thus, defendant argues, if a DHS component decides to modernize using an FSSP, a claim regarding that modernization effort cannot ripen until the component and the FSSP have executed an interagency agreement for implementation.  Plaintiff, on the other hand, argues that its claims ripen with respect to a particular DHS component when that component makes a decision in conjunction with an alternatives analysis to limit competition in a way that excludes plaintiff.  Plaintiff's argument is more persuasive.

Modernization of financial management software systems can be achieved in a number of ways; although OMB has stated a preference for migrating such systems to an SSP, it will also approve other properly justified approaches, such as upgrading an existing system or acquiring a new system from a commercial vendor via full and open competition.  Accordingly, when, after analyzing its alternatives for modernizing its financial management software system, a DHS component rejects the option of acquiring such a system and related services through a competitive process, it is making a final decision to forgo competition.  Contrary to defendant's contention, the fact that a DHS component must take additional steps before its migration to an FSSP is fully implemented does not make the decision to forgo competition any less final. Indeed, such a decision–an affirmative choice of one procurement method (a sole-source procurement) over all others (including full and open competition)–is subject to judicial review, see generally Distributed Solutions, Inc. v. United States, 539 F.3d 1340 (Fed. Cir. 2008) (holding that the Court of Federal Claims possesses jurisdiction to review an agency's decision to add work to an existing contract rather than conduct a competition), even if the DHS component may revisit the decision in the future.  Moreover, such a decision has an immediate, substantial impact on plaintiff because plaintiff is precluded from the opportunity to compete for, and being awarded, a potentially lucrative government contract.

The decision by a DHS component to forgo competition and acquire a financial management software system using an FSSP is a final decision, but the next question that arises is:  when does that final decision actually occur?  The decision, along with the rationale and legal

---

[13]  Defendant limits its ripeness argument to plaintiff's claims as they relate to ICE and its customers (USCIS, NPPD, S&T, OHA, and DHS Management).  Nevertheless, because defendant's arguments are generally applicable to any engagement in the multistep financial management software system modernization process, the court will address the ripeness of plaintiff's claims with respect to all DHS components.

basis for the decision, may be memorialized in (1) an alternatives analysis; (2) the documents, if any, reflecting the necessary approvals from the Component Acquisition Executive, the chair of the Executive Steering Committee, FIT, and OMB; (3) the justification for using other than full and open competition; and/or (4) the justification for executing an interagency agreement.  All of these documents are relevant in evaluating whether a DHS component has complied with the pertinent procurement statutes and regulations and whether the component's decision is arbitrary, capricious, an abuse of discretion, or contrary to law.  Because this documentation may not be completed until the DHS component executes an interagency agreement with its chosen FSSP to officially begin the discovery phase, a challenge to the component's decision to forgo competition and conduct a sole-source procurement with an FSSP will not ripen until that agreement is executed.

The court's determination that plaintiff's claims with respect to a particular DHS component ripen once the component executes an interagency agreement for discovery with an FSSP leads to the following conclusions in this bid protest:

- Because the administrative record reflects that DHS executed an interagency agreement for discovery with an FSSP on behalf of the Coast Guard, TSA, and DNDO, plaintiff's claims with respect to these DHS components are ripe.

- Because defendant has represented, via a sworn declaration, that ICE, OHA, NPPD, S&T, USCIS, and DHS Management have not executed an interagency agreement for discovery with an FSSP, plaintiff's claims with respect to these DHS components are not ripe.

- Because the administrative record and a sworn declaration from defendant reflect that FLETC conducted a competition to upgrade its existing financial management software system, and therefore has not initiated a migration to an FSSP, plaintiff's claims with respect to FLETC are not ripe.[14]

- Because defendant has represented, via a sworn declaration, that I&A and OPS remain customers of FLETC and have not independently initiated migrations to an FSSP, plaintiff's claims with respect to I&A and OPS are not ripe.

- Because defendant has represented, via a sworn declaration, that CBP has no current plans to upgrade its financial management software, plaintiff's claims with respect to CBP are not ripe.

---

[14]  Indeed, because FLETC conducted a competition to upgrade its existing financial management software system, plaintiff's amended complaint fails to state a claim upon which relief can be granted with respect to FLETC.

- Because defendant has represented, via a sworn declaration, that FEMA has not yet completed an alternatives analysis or executed an interagency agreement for discovery, plaintiff's claims with respect to FEMA are not ripe.

- Because defendant has represented, via a sworn declaration, that the Secret Service has an existing contract that covers technical upgrades to its financial management software system and therefore has not prepared an alternatives analysis or executed an interagency agreement for discovery, plaintiff's claims with respect to the Secret Service are not ripe.

In sum, the only ripe claims before the court are plaintiff's claims that the Coast Guard, TSA, and DNDO improperly decided to execute an interagency agreement with the Interior Business Center to acquire financial management software systems and related services, depriving it of an opportunity to compete.

## C.  Standing

Having resolved the issue of ripeness, the court next addresses plaintiff's standing to pursue its claims against the Coast Guard, TSA, and DNDO.

### 1.  Legal Standard

"[T]he question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." Warth v. Seldin, 422 U.S. 490, 498 (1975). "Traditional standing analysis invokes the "case or controversy" requirement of Article III of the Constitution." Sys. Application & Techs., Inc., 691 F.3d at 1382. However, in bid protests, standing "is framed by 28 U.S.C. § 1491(b)(1), which . . . imposes more stringent standing requirements than Article III." Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1359 (Fed. Cir. 2009). Under 28 U.S.C. § 1491(b)(1), bid protests may only be brought by "interested parties." The term "interested party" is construed in accordance with the Competition in Contracting Act of 1984, and, accordingly, "standing under § 1491(b)(1) is limited to actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract." Am. Fed'n of Gov't Emps. v. United States, 258 F.3d 1294, 1302 (Fed. Cir. 2001) (citing 31 U.S.C. § 3551(2)(A) (2000)); see also Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir. 2003) (interpreting this standard as requiring a protestor to show that it was an interested party prejudiced by the procuring agency's action and holding that "because the question of prejudice goes directly to the question of standing, the prejudice issue must be reached before addressing the merits"); Myers Investigative & Sec. Servs., Inc. v. United States, 275 F.3d 1366, 1370 (Fed. Cir. 2002) (defining "prejudice" as "injury"). Therefore, a party lodging a protest must establish that it "(1) is an actual or prospective bidder, and (2) possesses the requisite direct economic interest." Rex Serv. Corp. v. United States, 448 F.3d 1305, 1307 (Fed. Cir. 2006); see also Lujan v. Defenders of

<u>Wildlife</u>, 504 U.S. 555, 561 (1992) (noting that the burden of establishing standing is on "[t]he party invoking federal jurisdiction").

## 2. Plaintiff Has Standing to Pursue Its Ripe Claims

Defendant contends that plaintiff lacks standing because it is not an interested party under the definition set forth in the Competition in Contracting Act of 1984 and adopted by the United States Court of Appeals for the Federal Circuit ("Federal Circuit") in <u>American Federation of Government Employees</u>. To qualify as "an actual or prospective bidder or offeror" under the Competition in Contracting Act of 1984, a protestor must be challenging a solicitation for offers for a contract for the procurement of goods or services, the cancellation of such a solicitation, an award or proposed award of a contract for the procurement of goods or services, the termination or cancellation of such a contract, or the conversion of a function performed by federal employees to one performed by a private contractor. 31 U.S.C. § 3551(1)-(2). Defendant argues that plaintiff cannot be considered an actual or prospective bidder or offeror because execution of an interagency agreement–such as the discovery and implementation interagency agreements executed by DHS with the Interior Business Center–is not included in the list of actions that can be challenged in a bid protest, and because the interagency agreements executed by DHS and the Interior Business Center are not procurement contracts.

This bid protest presents unique circumstances. Normally, when a protestor contests a procuring agency's decision to forgo competition and conduct a sole-source procurement, the procuring agency has (1) cancelled a solicitation prior to consummating the sole-source procurement, <u>see, e.g.</u>, <u>RN Expertise, Inc. v. United States</u>, 97 Fed. Cl. 460, 464 (2011); (2) issued a sole-source solicitation, <u>see, e.g.</u>, <u>Def. Tech., Inc. v. United States</u>, 99 Fed. Cl. 103, 111 (2011); (3) awarded a sole-source contract, <u>see, e.g.</u>, <u>Emery Worldwide Airlines, Inc. v. United States</u>, 49 Fed. Cl. 211, 213, <u>aff'd</u>, 264 F.3d 1071 (Fed. Cir. 2001); (4) modified an existing contract, <u>see, e.g.</u>, <u>McAfee, Inc.</u>, 111 Fed. Cl. at 705; or (5) solicited a task order under an existing contract, <u>see, e.g.</u>, <u>id.</u> at 706. In such circumstances, there is no question that the procuring agency's actions are within the scope of 31 U.S.C. § 3551(1). Here, however, DHS accomplished its sole-source procurement by executing interagency agreements with the Interior Business Center.

Moreover, these agreements are not typical interagency agreements; although they are being used by DHS to acquire financial management software systems and related services on behalf of the Coast Guard, TSA, and DNDO, they will not result in an "interagency acquisition" as defined by the FAR. The FAR defines "interagency acquisition" as "a procedure by which an agency needing supplies or services (the requesting agency) obtains them from another agency (the servicing agency), by an assisted acquisition or a direct acquisition." FAR 2.101; <u>see also</u> FAR 17.502-2(a) (noting that the FAR applies to Economy Act transactions in which "one agency uses another agency's contract to obtain supplies or services"). An "assisted acquisition" occurs when "a servicing agency performs acquisition activities on a requesting agency's behalf, such as awarding and administering a contract, task order, or delivery order," and a direct

acquisition is when "a requesting agency places an order directly against a servicing agency's indefinite-delivery contract."  FAR 2.101; accord FAR 17.500(b).  The FAR does not apply to "[i]nteragency reimbursable work performed by Federal employees (other than acquisition assistance) or interagency activities where contracting is incidental to the purpose of the transaction[.]"  FAR 17.500(c)(1); accord FAR 17.502-2(a) (noting that the FAR does not apply to Economy Act transactions when "the interagency business transaction does not result in a contract or an order").  Here, DHS did not place an order against an Interior Business Center contract.  And, although the work performed by the Interior Business Center under the interagency agreement for discovery might be characterized as acquisition activities,[15] that work did not result in the Interior Business Center awarding a contract, task order, or delivery order on behalf of DHS, the Coast Guard, TSA, or DNDO to acquire financial management software systems and related services.[16]  Rather, the Interior Business Center intended to provide financial management software systems and related services directly to the Coast Guard, TSA, or DNDO via an interagency agreement.

From defendant's perspective, these unique facts are dispositive on the issue of standing.  Specifically, defendant argues that the interagency agreements executed by DHS and the Interior Business Center cannot be challenged in a bid protest because (1) the execution of interagency agreements is not expressly included in the list of actions that can be challenged under 31 U.S.C. § 3551(1), and (2) the FAR, which governs most executive agencies' acquisition of goods and services with appropriated funds, does not cover agreements in which one executive agency acquires goods or services directly from another agency.  Consequently, defendant contends, it is impossible for plaintiff (or any other commercial vendor) to be an actual or prospective bidder or offeror when a procuring agency executes an agreement with an FSSP; there can be no bidders or offerors without an actual or proposed contract.

---

[15]  Under the FAR, acquisition activities are those related to "the acquiring by contract with appropriated funds of supplies or services by and for the use of the Federal Government," such as activities related to "the description of requirements to satisfy agency needs" and the "solicitation and selection of sources . . . ."  FAR 2.101.  The interagency agreement for discovery incorporated a Statement of Work that described the work to be performed by the Interior Business Center as:  presenting to the Coast Guard, TSA, and DNDO the services it provides; reviewing and defining the requirements of the Coast Guard, TSA, and DNDO; analyzing the gaps between the services and requirements; and recommending a solution by which it could meet the needs of the Coast Guard, TSA, and DNDO.  These activities do not fit squarely within the FAR's conception of acquisition activities.

[16]  The Interior Business Center intended to meet some of its obligations under the interagency agreement for discovery by assigning tasks to a contractor under an existing contract.  The contractor would be assisting the Interior Business Center, and would not be delivering any supplies or services directly to the Coast Guard, TSA, or DNDO.  In other words, no task orders would be executed on behalf of the Coast Guard, TSA, and DNDO.

Plaintiff, for its part, contends that defendant's position conflicts with the Federal Circuit's decision in Distributed Solutions, Inc.  In that case, the government issued a Request for Information to commercial vendors, explaining that it was conducting market research regarding certain commercial-off-the-shelf software solutions.  539 F.3d at 1342.  Upon reviewing the commercial vendors' responses, the government decided to use one of its existing contractors to conduct the competition to select a new software provider rather than conducting its own competition.  Id. at 1342-43.  That contractor issued its own Request for Information and awarded subcontracts to selected commercial vendors.  Id. at 1343.  The protestors responded to both Requests for Information, but were not awarded a subcontract.  Id.  Notably, the government did not itself take any of the actions described in 31 U.S.C. § 3551(1)–it did not issue a solicitation for offers for a contract for the procurement of the software, cancel such a solicitation, award or propose awarding a contract for the procurement of the software, terminate or cancel such a contract, or convert a function performed by federal employees to one performed by a private contractor.  Nevertheless, the Federal Circuit concluded that the protestors had standing as interested parties.  Id. at 1344-45.  Specifically, it determined that the original Request for Information, which the government used to determine its need for the specified software, initiated a procurement.  Id. at 1346.  It therefore held that because the protestors had responded to the Request for Information and were prepared to submit bids had the government issued a Request for Quotations, the protestors were prospective bidders in that procurement.  Id. at 1344-45.

The court agrees with defendant that 31 U.S.C. § 3551(1) does not expressly contemplate a protestor challenging the execution of an interagency agreement.  It also agrees that the FAR does not apply when one executive agency acquires goods or services directly from another executive agency; although the purpose of the interagency agreements between DHS and the Interior Business Center is the acquisition of services, such agreements are not considered contracts for the purposes of the FAR.  See, e.g., FAR 2.101 (defining "contracting" as "purchasing, renting, leasing, or otherwise obtaining supplies or services from nonfederal sources"); FAR 17.500 (indicating that interagency acquisitions are governed by the FAR, but noting that interagency acquisitions occur only when "(1) [a]n agency needing supplies or services obtains them using another agency's contract; or (2) [a]n agency uses another agency to provide acquisition assistance, such as awarding and administering a contract, a task order, or delivery order.").  However, as demonstrated by its decision in Distributed Solutions, Inc., the Federal Circuit has not construed the term "interested party" as narrowly as defendant suggests. Rather, even if the decision challenged by a protestor does not involve a solicitation or contract as contemplated by 31 U.S.C. § 3551(1) or a contract or interagency agreement as defined by the FAR, a protestor can be an interested party under 28 U.S.C. § 1491(b)(1) if it establishes that (1) it is a prospective bidder or offeror in a procurement or proposed procurement and (2) it has a direct economic interest in the procurement or proposed procurement.  Accord Santa Barbara Applied Research, Inc. v. United States, 98 Fed. Cl. 536, 537-41, 543 (2011) (concluding that the protestor had standing as an interested party to challenge a procuring agency's decision, after evaluating several procurement options such as obtaining the services from a commercial vendor, to in-source the services previously performed by the protestor).

To be considered a prospective offeror, plaintiff must demonstrate that it was qualified to provide financial management software systems and related services to the Coast Guard, TSA, and DNDO, and that it would have submitted an offer had there been a competition. See Myers Investigative & Sec. Servs., Inc., 275 F.3d at 1370-71. Plaintiff has satisfied this burden; it currently provides such systems and services to several DHS components; its parent company, Savantage Solutions, responded to the Coast Guard's May 16, 2013 Request for Information regarding the availability of such systems and services in the commercial market; and it asserts that it would submit an offer if there was a competition. In other words, there is sufficient evidence that plaintiff "was qualified to secure the awards if they had been made the subject of" a competition. Id. at 1371.

To establish a direct economic interest in the procurement initiated by the Coast Guard, TSA, and DNDO to acquire financial management software systems and related services, plaintiff must demonstrate that it could have competed for the contract had there been a competition. See id. at 1370-71. As noted above, plaintiff was qualified to submit an offer had the Coast Guard, TSA, and DNDO conducted competitions to acquire financial management software systems and related services. Moreover, the Federal Circuit has concluded that protestors who have been deprived of the opportunity to compete for the provision of specified products or services and who allege the loss of "significant business opportunities" as a result of the decision to forgo competition have established a direct economic interest in the proposed procurement. See Distributed Solutions, Inc., 539 F.3d at 1345; see also Weeks Marine, Inc., 575 F.3d at 1361-63 (noting that in some circumstances, a protestor has a direct economic interest if it demonstrates "a 'non-trivial competitive injury which can be addressed by judicial relief'" (quoting WinStar Commc'ns, Inc. v. United States, 41 Fed. Cl. 748, 763 (1998))). In this case, the DHS components' decisions to migrate to an FSSP deprived plaintiff of an opportunity to compete for the provision of financial management software systems and related services, and plaintiff contends that as a result, it is poised to "lose substantial business with the very real possibility that it will be pushed out of the market." Pl.'s Mot. for J. on the AR 71. Plaintiff has accordingly demonstrated a direct economic interest.

Because plaintiff has established that it is a prospective offeror with a direct economic interest in the procurement of financial management software systems and related services, it is an interested party pursuant to 28 U.S.C. § 1491(b)(1), and has standing to protest the decisions of the Coast Guard, TSA, and DNDO not to conduct a competitive procurement.

## D. Reviewability of DHS's Decision to Execute Interagency Agreements With the Interior Business Center on Behalf of the Coast Guard, TSA, and DNDO

Defendant's final contention in its motion to dismiss is that DHS's decision to execute agreements with the Interior Business Center to acquire financial management software systems and related services for the Coast Guard, TSA, and DNDO is not subject to judicial review. In particular, defendant argues that with respect to these interagency agreements, plaintiff may only challenge purported violations of statute and regulation in connection with DHS's procurement,

and not purported arbitrary and capricious conduct or purported violations of internal government memoranda.  Defendant further argues that the court cannot review DHS's exercise of its authority under the Economy Act and the Government Management Reform Act of 1994 to execute the interagency agreements.  The court addresses each argument in turn.

## 1. Plaintiff's Allegations That Certain Actions of the Coast Guard, TSA, and DNDO Were Arbitrary, Capricious, an Abuse of Discretion, and Irrational

Defendant's first argument concerns plaintiff's allegations of arbitrary and capricious conduct.  In the third claim for relief of its amended complaint, plaintiff generally contends that any decisions by DHS components to acquire, or to enter into an agreement to acquire, financial management software systems and related services without competition were arbitrary, capricious, an abuse of discretion, and contrary to law.  In its motion for judgment on the administrative record, plaintiff more narrowly asserts that certain conduct of the Coast Guard, TSA, and DNDO was arbitrary, capricious, an abuse of discretion, and irrational.  Defendant contends that under the plain language of 28 U.S.C. § 1491(b)(1), the court lacks jurisdiction over these contentions.

As noted above, the Court of Federal Claims possesses jurisdiction to entertain bid protests by interested parties objecting to a solicitation for bids or proposals for a proposed contract, a proposed contract award, a contract award, or "any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."  28 U.S.C. § 1491(b)(1).  All but the final category of bid protest jurisdiction described in 28 U.S.C. § 1491(b)(1) require the existence of a contract or a proposed contract.  Although the term "contract" is not defined in 28 U.S.C. § 1491(b)(1), the Federal Circuit has held that 28 U.S.C. § 1491(b)(1) "is exclusively concerned with procurement solicitations and contracts."  Res. Conservation Grp., LLC v. United States, 597 F.3d 1238, 1245 (Fed. Cir. 2010).  And the FAR, the regulation that governs most executive agencies' acquisition of goods and services, does not treat interagency agreements similar to the ones executed by DHS and the Interior Business Center as procurement contracts.  See, e.g., FAR 2.101 (defining "contracting" as "purchasing, renting, leasing, or otherwise obtaining supplies or services from nonfederal sources"); FAR 17.500 (indicating that interagency acquisitions are governed by the FAR, but noting that interagency acquisitions occur only when "(1) [a]n agency needing supplies or services obtains them using another agency's contract; or (2) [a]n agency uses another agency to provide acquisition assistance, such as awarding and administering a contract, a task order, or delivery order.").  Accordingly, plaintiff may only invoke the final category of bid protest jurisdiction described in 28 U.S.C. § 1491(b)(1).  In other words, the court cannot entertain plaintiff's contentions that certain conduct of the Coast Guard, TSA, and DNDO was arbitrary, capricious, an abuse of discretion, and irrational.

## 2.  Plaintiff's Contentions That the Coast Guard, TSA, and DNDO Violated OMB and DHS Memoranda

Defendant's next argument concerns plaintiff's contentions that the Coast Guard, TSA, and DNDO failed to comply with certain OMB and DHS memoranda.  In its motion for judgment on the administrative record, plaintiff contends that (1) the Coast Guard and DNDO did not comply with the requirement set forth in DHS's September 21, 2011 memorandum that DHS components obtain the approval of the DHS Under Secretary for Management prior to expending funds for discovery, and (2) the Coast Guard, TSA, and DNDO violated several memoranda–OMB Memorandum M-10-26, DHS's September 21, 2011 memorandum, and DHS's September 5, 2011 Acquisition Decision Memorandum–by allowing the duration of their financial management software system modernization efforts to extend beyond twenty-four months.  Defendant argues that the memoranda cited by plaintiff are merely internal agency guidance and are not statutes or regulations that can be challenged under 28 U.S.C. § 1491(b)(1).  Plaintiff has not attempted to rebut defendant's contention.

In Hamlet v. United States, the Federal Circuit held that a manual or handbook promulgated by an agency

> is a regulation entitled to the force and effect of law if (1) the promulgating agency was vested with the authority to create such a regulation; (2) the promulgating agency conformed to all procedural requirements, if any, in promulgating the regulation; (3) the promulgating agency intended the provision to establish a binding rule; and (4) the provision does not contravene a statute.  In determining whether a provision was intended to be binding, the court should consider (a) whether the language of the provision is mandatory or advisory; (b) whether the provision is "substantive" or "interpretive"; (c) the context in which the provision was promulgated; and (d) any other extrinsic evidence of intent.

63 F.3d 1097, 1105 (Fed. Cir. 1995).  The Court of Federal Claims has applied this test in bid protests.  See, e.g., Novell, Inc. v. United States, 46 Fed. Cl. 601, 615 (2000) (discussing the Guide to Judiciary Policies and Procedures); Labat-Anderson, Inc. v. United States, 42 Fed. Cl. 806, 839-40 (1999) (discussing United States Agency for International Development Contract Information Bulletin 85-17).  Plaintiff has offered no evidence indicating that OMB and DHS intended their memoranda to have the force and effect of law.  Indeed, the statement in the OMB memorandum that the duration of financial management software system modernization projects "should not exceed 24 months," AR 2, is merely advisory in nature.  And, although both DHS memoranda contain mandatory language (requiring DHS components to present their alternatives analyses to DHS's Management Directorate for approval and requiring each DHS component's modernization efforts to conclude within eighteen to twenty-four months), there is no evidence that DHS disseminated them to the public, a fact that weighs against a finding that DHS intended them to be binding.  See Novell, Inc., 46 Fed. Cl. at 615 ("[T]o be entitled to force and effect of law, a binding agency regulation 'must, at the very least, be promulgated by an agency with the

-34-

intent that it establishes a binding rule.  Promulgation requires some act of publication, i.e., dissemination to the public.'" (quoting Labat-Anderson, Inc., 42 Fed. Cl. at 839)).  Moreover, none of the memoranda bears any indication that they were written for the benefit of federal contractors hoping to compete to provide financial management software systems and related services to DHS or its components, which is required for plaintiff to protest their purported violation.  See Freightliner Corp. v. Caldera, 225 F.3d 1361, 1365 (Fed. Cir. 2000) ("In order for a private contractor to bring suit against the Government for violation of a regulation, that regulation must exist for the benefit of the private contractor."); Cessna Aircraft Co. v. Dalton, 126 F.3d 1442, 1451-52 (Fed. Cir. 1998) ("The primary intent of a statute or regulation must be to protect or benefit a class of persons in order for that class to be able to bring suit against the government for violating the statute or regulation. . . . [I]f the primary intended beneficiary of a statute or regulation is the government, then a private party cannot complain about the government's failure to comply with that statute or regulation, even if that party derives some incidental benefit from compliance with it.").  Therefore, the court cannot entertain plaintiff's contentions that the Coast Guard, TSA, and DNDO violated the OMB and DHS memoranda.

### 3. Plaintiff's Challenges to DHS's Execution of the Interagency Agreements With the Interior Business Center

Defendant's final argument in its motion to dismiss concerns plaintiff's contentions that DHS improperly executed interagency agreements with the Interior Business Center on behalf of the Coast Guard, TSA, and DNDO.  Plaintiff, in its motion for judgment on the administrative record, contends that the Coast Guard, TSA, and DNDO violated the Competition in Contracting Act of 1984, the regulations implementing the Competition in Contracting Act of 1984, the regulations implementing the Economy Act, and the Government Management Reform Act of 1994 by entering into the discovery and implementation phases with the Interior Business Center.  Defendant notes that the interagency agreement for the discovery phase was authorized by the Economy Act and the interagency agreement for the implementation phase was authorized by the Government Management Reform Act of 1994.  Both of these statutes, defendant contends, provide executive agencies with the discretion to make appropriations decisions.  Defendant argues that this discretion renders DHS's decision to execute the interagency agreements with the Interior Business Center unreviewable.

To properly address defendant's argument, the court must revisit the issues of subject matter jurisdiction and standing.  The court has determined that it possesses subject matter jurisdiction to entertain plaintiff's claims that the Coast Guard, TSA, and DNDO violated statutes and regulations in connection with a procurement and that plaintiff has standing as an interested party to protest the decisions of the Coast Guard, TSA, and DNDO to forgo competition because it is a prospective offeror with a direct economic interest in the procurement.  In Distributed Solutions, Inc., the Federal Circuit held that for the purposes of 28 U.S.C. § 1491(b)(1), a procurement "'includes all stages of the process of acquiring property or services, beginning with the process for determining a need for property or services and ending with contract completion and closeout.'"  539 F.3d at 1345 (emphasis omitted) (quoting 41

U.S.C. § 403(2) (2006)).  Under this definition, the Coast Guard, TSA, and DNDO initiated procurements when they began to gather information concerning their options for modernizing their financial management software systems.  And, had the Coast Guard, TSA, and DNDO awarded contracts to acquire financial management software systems and related services, their procurements would have concluded upon the completion of those contracts.  However, as previously discussed, the Coast Guard, TSA, and DNDO did not award contracts–as that term is understood under the FAR–to acquire financial management software systems and related services.  Rather, DHS consummated its components' acquisitions using interagency agreements.  Accordingly, as a matter of logic, the procurements initiated by the Coast Guard, TSA, and DNDO must have concluded upon DHS's execution of its initial interagency agreement with the Interior Business Center on behalf of the Coast Guard, TSA, and DNDO.  Consequently, plaintiff cannot challenge any actions by the Coast Guard, TSA, and DNDO that postdate the initial interagency agreement between DHS and the Interior Business Center.[17]  In the absence of a procurement, plaintiff cannot invoke the court's subject matter jurisdiction under 28 U.S.C. § 1491(b)(1).  Nor can plaintiff establish that it is an interested party for the purposes of standing; without a procurement, plaintiff cannot be an actual or prospective bidder.

The court's determination that the procurement being protested by plaintiff concluded upon the execution of the initial interagency agreement between DHS and the Interior Business Center renders defendant's arguments relating to the execution of the interagency agreement for implementation moot.  Thus, the court need not consider whether DHS violated the Government Management Reform Act of 1994, or any other statute or regulation, in executing that agreement with the Interior Business Center.  With respect to defendant's Economy Act argument, the court notes that plaintiff is not challenging DHS's selection of the Economy Act as the relevant authority for its interagency agreement with the Interior Business Center.  Rather, plaintiff contends that DHS, having exercised its discretion to execute an Economy Act agreement, must comply with the requirements set forth in the Economy Act's implementing regulations.  Such a contention is subject to judicial review.  Accord RN Expertise, Inc., 97 Fed. Cl. at 471-72 (concluding that the procuring agency failed to prepare a D&F pursuant to FAR 17.502-2, but

---

[17]  Even if plaintiff could challenge such actions, and was successful in doing so, it would not be able to establish that it was prejudiced by any improprieties.  See Bannum, Inc. v. United States, 404 F.3d 1346, 1351 (Fed. Cir. 2005) (holding that if the procuring agency's decision was made in violation of the applicable statutes, regulations, or procedures, the court must then "determine, as a factual matter, if the bid protester was prejudiced by that conduct").  "To establish prejudice . . . , a protester must show that there was a 'substantial chance' it would have received the contract award absent the alleged error."  Banknote Corp. of Am. v. United States, 365 F.3d 1345, 1350 (Fed. Cir. 2004) (quoting Emery Worldwide Airlines, Inc., 264 F.3d at 1086).  If the court concluded that the Coast Guard, TSA, and/or DNDO violated a statute or regulation during the discovery or implementation phases of their financial management software system modernization efforts, those DHS components could correct the errors without revisiting their initial decision to forgo competition and use an FSSP.  Accordingly, plaintiff would not have a substantial chance of receiving a contract award and therefore would suffer no prejudice.

that the protestor was not prejudiced by that failure); Nat'l Gateway Telecom, Inc. v. Aldridge, 701 F. Supp. 1104, 1114, 1116 (D.N.J. 1988) (holding that the procuring agency's decision to acquire equipment from another agency pursuant to the Economy Act was proper), aff'd mem., 879 F.2d 858 (3d Cir. 1989).

## E.  Conclusion

The court has dismissed many of plaintiff's allegations for lack of jurisdiction or as nonjusticiable.  The only substantive issue remaining for the court's resolution is whether the Coast Guard, TSA, and DNDO violated the Competition in Contracting Act of 1984, the regulations implementing the Competition in Contracting Act of 1984, or the regulations implementing the Economy Act when they decided to forgo competition and acquire financial management software systems and related services on a sole-source basis from the Interior Business Center.  The court addresses this issue in the context of the parties' cross-motions for judgment on the administrative record.

## III.  THE PARTIES' CROSS-MOTIONS FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

Both parties have moved for judgment on the administrative record pursuant to Rule 52.1(c) of the Rules of the United States Court of Federal Claims ("RCFC").  In ruling on such motions, "the court asks whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record."  A & D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 131 (2006) (citing Bannum, Inc., 404 F.3d at 1356).  Because the court makes "factual findings . . . from the record evidence," judgment on the administrative record "is properly understood as intending to provide for an expedited trial on the administrative record." Bannum, 404 F.3d at 1356.

### A.  Standard of Review

When entertaining a motion for judgment on the administrative record in a bid protest, the Court of Federal Claims reviews the challenged agency action pursuant to the standards set forth in 5 U.S.C. § 706.  28 U.S.C. § 1491(b)(4).  Although section 706 contains several standards, "the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A):  a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"  Banknote Corp. of Am., 365 F.3d at 1350.

In this bid protest, the only question before the court is whether the procuring agencies acted in accordance law.  The court "may set aside a procurement action if '. . . the procurement procedure involved a violation of regulation or procedure.'"  Centech Grp., Inc. v. United States, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (quoting Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001)).  Because procurement officials "are

entitled to exercise discretion upon a broad range of issues confronting them in the procurement process," Impresa, 238 F.3d at 1332 (internal quotation marks omitted), when a protestor claims that the procuring agency's decision violates a statute, regulation, or procedure, it must show that the violation was "clear and prejudicial," id. at 1333 (internal quotation marks omitted).

**B.  The Competition in Contracting Act of 1984 and Its Implementing Regulations**

Plaintiff first argues that the Coast Guard, TSA, and DNDO violated the Competition in Contracting Act of 1984 and its implementing regulations when they decided to forgo competition and acquire financial management software systems and related services on a sole-source basis from the Interior Business Center.  Specifically, plaintiff contends that the Coast Guard, TSA, and DNDO did not fulfill the requirements of 41 U.S.C. § 3304(e)(1) and FAR 6.303 to justify, in writing, the use of other than full and open competition.

Although executive agencies are normally required to obtain property and services through full and open competition, they may use noncompetitive procedures in certain circumstances.  41 U.S.C. §§ 3301(a), 3304(a).  When, as here, a statute authorizes an executive agency to procure property or services from another executive agency, the procuring agency must justify its decision to forgo competition in writing.  Id. § 3304(e)(1); FAR 6.303-1(a).  The justification must include certain, specified information.  41 U.S.C. § 3304(e)(2); FAR 6.303-2(a) to (b).  And, the justification must be approved by the appropriate official and made publicly available within fourteen days after contract award.  41 U.S.C. § 3304(e)(1), (f); FAR 6.305.

Plaintiff is correct that the administrative record does not include any documents that are specifically designated as the justifications required by the Competition in Contracting Act of 1984 and its implementing regulations.  However, the administrative record does include an A-127 Justification, which was prepared by the Coast Guard on July 3, 2013, to allow it, TSA, and DNDO to use a noncompetitive method (migration to an FSSP) to acquire financial management software systems and related services.  In section 7.D of Circular No. A-127, OMB specifies that a justification to forgo full and open competition should generally include the information required by FAR 6.303-2.  Accordingly, an A-127 Justification can satisfy the requirements of the Competition in Contracting Act of 1984 and its implementing regulations.

The A-127 Justification prepared by the Coast Guard, broadly construed, contains much of the required information.  However, five required elements are missing:  (1) "[a]n identification of the statutory authority permitting other than full and open competition," FAR 6.303-2(b)(4); accord 41 U.S.C. § 3304(e)(2)(B); (2) "[a] demonstration that the proposed contractor's unique qualifications or the nature of the acquisition requires use of the authority cited," FAR 6.303-2(b)(5); accord 41 U.S.C. § 3304(e)(2)(B); (3) "[a] determination by the contracting officer that the anticipated cost to the Government will be fair and reasonable," FAR 6.303-2(b)(7); accord 41 U.S.C. § 3304(e)(2)(C); (4) "[a] statement of the actions, if any, the agency may take to remove or overcome any barriers to competition before any subsequent acquisition for the supplies or services required," FAR 6.303-2(b)(11); accord 41 U.S.C.

-38-

§ 3304(e)(2)(F); and (5) "[c]ontracting officer certification that the justification is accurate and complete to the best of the contracting officer's knowledge and belief," FAR 6.303-2(b); accord 41 U.S.C. § 3304(e)(1)(A).  By omitting these required elements, the Coast Guard, TSA, and DNDO violated the Competition in Contracting Act of 1984 and its implementing regulations.[18]

Of course, it is not enough for plaintiff to establish violations of statute and regulation. Plaintiff must also demonstrate that it was prejudiced by the violations.  Bannum, Inc., 404 F.3d at 1351.  "To establish prejudice . . . , a protester must show that there was a 'substantial chance' it would have received the contract award absent the alleged error."  Banknote Corp. of Am., 365 F.3d at 1350 (quoting Emery Worldwide Airlines, Inc., 264 F.3d at 1086); see also Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996) ("[T]o establish prejudice, a protester must show that, had it not been for the alleged error in the procurement process, there was a reasonable likelihood that the protester would have been awarded the contract.").  Plaintiff has not made the necessary showing.

First, some of the information omitted from the A-127 Justification is found elsewhere in the administrative record.  In particular, DHS's September 9, 2013 D&F identifies the Economy Act as the statutory authority for the acquisition of financial management software systems and related services from an FSSP and explains why an Economy Act agreement is appropriate.  In addition, a number of documents–including the alternatives analyses and the A-127 Justification–reflect the conclusion of the Coast Guard, TSA, and DNDO that migration to an FSSP was a comparatively low-cost option, strongly suggesting their belief that the costs that they anticipated incurring were fair and reasonable.  Second, requiring the Coast Guard, TSA, and DNDO to add a statement regarding how they might be able to conduct a full and open competition in a future procurement would not affect whether plaintiff had a chance of being awarded a contract in the present procurement.  Finally, although the A-127 Justification lacks any contracting officer certifications, its conclusion was endorsed by the Chief Financial Officers, Chief Information Officers, and Chief Acquisition Officers of the Coast Guard, TSA, and DNDO, all of which are higher-level officials than a contracting officer.  In sum, the Coast Guard's failure to include all of the information in the A-127 Justification that is required by 41 U.S.C. § 3304(e) and FAR 6.303-2(b) amounts to nothing more than harmless error.  As such, plaintiff was not prejudiced by the omissions.  Consequently, plaintiff cannot prevail on its claim that the Coast Guard, TSA, and DNDO violated the Competition in Contracting Act of 1984 and its implementing regulations.

---

[18]  Plaintiff alleges one additional statutory and regulatory violation:  the failure of the Coast Guard, TSA, and DNDO to make the A-127 Justification publicly available.  Both the Competition in Contracting Act of 1984 and its implementing regulations generally require justifications to use noncompetitive procedures to be made publicly available "within 14 days after contract award."  41 U.S.C. § 3304(f)(1); FAR 6.305(a).  As noted above, the decision to migrate to an FSSP means that no contract–as that term is understood in the FAR–was ever awarded.  Accordingly, the public availability requirement was not violated.

## C.  The Economy Act's Implementing Regulations

Plaintiff also argues that the Coast Guard, TSA, and DNDO violated the Economy Act's implementing regulations when they decided to forgo competition and acquire financial management software systems and related services on a sole-source basis from the Interior Business Center.  Specifically, plaintiff contends that the Coast Guard, TSA, and DNDO violated FAR subpart 17.5 because the "Determination of Best Procurement Approach" and the D&F prepared by DHS on September 9, 2013, upon which they relied did not meet the requirements of FAR subpart 17.5.  However, as explained above, FAR subpart 17.5 does not apply to the acquisition at issue here, where one executive agency (DHS) is acquiring goods or services directly from another executive agency (the Interior Business Center).  Thus, any deficiencies in DHS's "Determination of Best Procurement Approach" and D&F are irrelevant in the context of plaintiff's bid protest.  Accordingly, plaintiff cannot prevail on its claim that the Coast Guard, TSA, and DNDO violated the Economy Act's implementing regulations.

## D.  Conclusion

Plaintiff has failed to establish "clear and prejudicial" violations of the Competition in Contracting Act of 1984, its implementing regulations, or the regulations implementing the Economy Act.  In other words, it has not succeeded on the merits of its claims.  Therefore, the court need not address the remaining elements of plaintiff's request for injunctive relief.

## IV.  PLAINTIFF'S REMAINING MOTIONS

In addition to requesting judgment on the administrative record, plaintiff moves to supplement the administrative record and for leave to file a second amended complaint.  The court addresses each motion in turn.

## A.  Plaintiff's Motion to Supplement the Administrative Record

Plaintiff moves to supplement the administrative record, which only contains documents pertaining to the decisions of the Coast Guard, TSA, and DNDO to migrate to an FSSP, with "all documents supporting the decisions of [DHS] and its components . . . to acquire financial management software systems or related services in a manner that precludes [it] from having an opportunity to compete."  Pl.'s Mot. to Supplement 1.  Plaintiff explains that it "is not requesting that the Court consider documents that were not before the other DHS components when they made their respective decisions," but is instead "requesting that Defendant provide the material that has been developed and considered by the other DHS components in making those decisions."  Id. at 1-2.  Because the evidence before the court reflects that plaintiff's claims are ripe only with respect to the Coast Guard, TSA, and DNDO, supplementation of the administrative record with respect to the other DHS components would not be appropriate.  Consequently, plaintiff's motion to supplement the administrative record is denied.

## B. Plaintiff's Motion for Leave to File a Second Amended Complaint

Plaintiff also moves for leave to file a second amended complaint to (1) "conform to the facts and evidence developed by the Administrative Record" and (2) raise two issues "not currently addressed in the pleadings." Pl.'s Mot. to Am. 1. The first new issue is the Interior Business Center's purported unlawful expansion of the scope of its sole-source bridge contract with APG Intel "to accommodate the costly and lengthy implementation phase" for the Coast Guard, TSA, and DNDO. Id. The second new issue is the Interior Business Center's purported intent to amend its license agreement with Oracle to add the Coast Guard, TSA, and DNDO as customers.

Under RCFC 15(a)(2), parties may amend their pleadings with the court's leave, and "[t]he court should freely give leave when justice so requires." However, the court need not permit an amendment if the amendment would be futile. See Foman v. Davis, 371 U.S. 178, 182 (1962) ("If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason–such as . . . futility of amendment, etc.–the leave sought should, as the rules require, be 'freely given.'").

With respect to plaintiff's first proposed amendment to its amended complaint–conformance with the evidence contained in the administrative record–the court concludes that such amendment is unnecessary because the court has based the rulings in this Opinion and Order on the facts contained in the administrative record and the arguments set forth in plaintiff's motion for judgment on the administrative record. With respect to plaintiff's second proposed amendment to its amended complaint–raising two new issues–the court concludes that such amendment would be futile. As explained above, the procurements at issue in this bid protest concluded when DHS and the Interior Business Center executed the interagency agreement for the discovery phase. Because the court's subject matter jurisdiction and plaintiff's standing as an interested party are dependent upon the existence of a procurement, the court cannot entertain challenges to actions that postdate the interagency agreement for the discovery phase, such as the Interior Business Center's modification of its sole-source bridge contract to add implementation-related tasks and intended amendment of its license agreement with Oracle. Consequently, it makes no sense to grant plaintiff leave to file a second amended complaint, and its motion is therefore denied.

## V. CONCLUSION

For the reasons set forth above, the court **GRANTS IN PART** and **DENIES IN PART** defendant's motion to dismiss, **DENIES** plaintiff's motion for judgment on the administrative record, **GRANTS** defendant's cross-motion for judgment on the administrative record, **DENIES** plaintiff's motion to supplement the administrative record, and **DENIES** plaintiff's motion for leave to file a second amended complaint. The clerk shall therefore close this bid protest and enter judgment accordingly.

The court has filed this ruling under seal.  The parties shall confer to determine agreed-to proposed redactions.  Then, by **no later than Monday, September 14, 2015**, the parties shall file a joint status report indicating their agreement with the proposed redactions, **attaching a copy of those pages of the court's ruling containing proposed redactions, with all proposed redactions clearly indicated.**

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge

# APPENDIX

Selected Acronyms and Abbreviations

| | |
|---|---|
| CAS | Core Accounting System |
| CBP | United States Customs and Border Protection |
| CSSP | Commercial Shared Service Provider |
| D&F | Determination and Findings |
| DHS | United States Department of Homeland Security |
| DHS Management | Office of the Secretary and Under Secretary for Management |
| DNDO | Domestic Nuclear Detection Office |
| Executive Steering Committee | Financial Systems Modernization Executive Steering Committee |
| FAME | FIT Agency Modernization Evaluation |
| FEMA | Federal Emergency Management Administration |
| FIT | Office of Financial Innovation and Transformation |
| FLETC | Federal Law Enforcement Training Center |
| FSSP | Federal Shared Service Provider |
| I&A | Office of Intelligence and Analysis |
| ICE | Immigration and Customs Enforcement |

| | |
|---|---|
| MOE | Measures of Operational Effectiveness |
| NPPD | National Protection and Programs Directorate |
| OHA | Office of Health Affairs |
| OMB | Office of Management and Budget |
| OPS | Office of Operations Coordination |
| ROM | Rough Order of Magnitude |
| S&T | Science and Technology Directorate |
| SSP | Shared Service Provider |
| TSA | Transportation Security Administration |
| USCG | United States Coast Guard |
| USCIS | United States Citizenship and Immigration Services |
| USVISIT | United States Visitor and Immigrant Status Indicator Technology |